Pennsylvania Railroad Company *v.* Driscoll et al.,
Appellants, et al.

98

Argued January 31, 1938.   Before KEPHART, C. J.,
SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Charles J. Margiotti,* Attorney General, and *Edward Friedman,* Deputy Attorney General, with them *E. Russell Shockley,* Deputy Attorney General, and *George W. Keitel,* Assistant Deputy Attorney General, for appellants.

*Edward Knuff,* for Public Utility Commission, appellant.

*John Dickinson,* with him *John B. Prizer, Spencer G. Nauman* and *Henry Wolf Biklé,* for appellee.

*Tom J. McGrath,* for intervenors.

OPINION BY MR. CHIEF JUSTICE KEPHART, March 31, 1938:

The legislature passed, on June 1, 1937, a law popularly known as the Full Crew Act, P. L. 1120, providing minimum requirements for the size of crews on all trains operated in the Commonwealth. It was to become effective immediately and carried a penalty of $100 for each violation of the law.

Appellee filed a bill to enjoin its enforcement and a preliminary injunction was granted. The hearing on

the motion to continue was postponed to June 21st. This hearing lasted until July 27th, when 2,400 pages of testimony had been taken. The injunction was continued and September 7th was fixed as the date for final hearing. On August 5th, defendants appealed to this Court. The right to appeal was challenged by appellee in a motion to quash. The reasons assigned were that as the appeal was from the order continuing the injunction made July 27th, it was from an interlocutory decree and the questions that might be raised on appeal from the granting of the preliminary injunction were thus waived: *Chiswell v. Campbell,* 296 Pa. 228, 229.

Appellants in answer contend the appeal is from the refusal of the court below to dissolve the preliminary injunction, and, as it was granted without notice, that the refusal to dissolve is equivalent to the granting of a preliminary injunction. They cite *National Automobile Service, Inc., v. Barfod,* 288 Pa. 227. They also argue that in any event the appeal is good from the order continuing the preliminary injunction.

The Act of February 14, 1866, P. L. 28, permitting appeals from the granting of preliminary injunctions did not provide for appeal from an order continuing a preliminary injunction. See *Transue v. Gregorashzuk,* 295 Pa. 529; *Chiswell v. Campbell,* supra. These are interlocutory orders, *Drum v. Dinkelacker,* 262 Pa. 392, and not appealable: *Transue v. Gregorashzuk,* supra. Nor is there an act permitting appeal from refusal to dissolve a preliminary injunction: *Drum v. Dinkelacker,* supra, at 395. Moreover, defendants by joining in the hearing, and participating fully in cross-examining at length the witnesses, might well be said to have waived the right of appeal from the original order. However, we will not at this time decide the motion to quash. The Commonwealth in its sovereign capacity has averred and asserts the total absence of right or power in the court below to grant or continue the injunction. We will, therefore, consider these questions.

The Commonwealth, in asserting that the court below was without warrant to grant the injunction on the bill, or to continue it after the evidence had been submitted on July 27th, avers that in the exercise of its sound discretion it should have found that no valid grounds were presented by the bill, and that any rule of the law that might have been invoked was palpably wrong or clearly inapplicable, citing *Commonwealth v. Katz,* 281 Pa. 287. They contend that the bill does not aver, and the evidence fails to establish any facts creating a reasonable doubt as to the constitutionality of the law, and that there was no reason given by the court below as to why the exercise of the police power of the State should be halted temporarily or permanently. They argue the right in appellee was not clear and there was no irreparable injury threatened. Of course if defendants' position should be sustained by the entire record, as here presented, the court below would have been clearly wrong.

It is true that a preliminary injunction should not be granted at the arbitrary will or whim of the court but only in the exercise of sound judicial discretion. There should be no balancing of conveniences, but it should be clear that greater injury would be done by refusing it than in granting it: *Audenried v. Phila. & Reading R. R. Co.,* 68 Pa. 370, 375; *Kittanning Brewing Co. v. American Nat. Gas Co.,* 224 Pa. 129, 130; *Mammoth Vein Coal Co.'s Appeal,* 54 Pa. 183. This is the rule in any case. It is equally clear, however, that where it appears that the challenge to the constitutionality of a statute which on its face imposes a heavy penalty for failure to obey its mandate is in good faith, and where the evidence purports to show a need for relief from allegedly exorbitant, oppressive and illegal exactions of money to comply with the mandate pending judicial determination, and where no existent rights are prejudiced, then under Sections 1, 9 and 11 of Article I of our State Constitution, and under the due process clause

of the Federal Constitution, it is not only the right, but the duty of the court to stay the operation of the penalties, and the law itself, until its constitutionality has been determined. If judges fail in this duty they violate their oath of office. See *Rohrer v. Milk Control Bd.,* 322 Pa. 257; *Ex Parte Young,* 209 U. S. 123, at 143; *Oklahoma Operating Co. v. Love,* 252 U. S. 331.

The language of the bill and affidavits was not insufficient to warrant the action of the court, as argued. While many of the averments are general, of their nature they must be so. It is not necessary that the bill should recite the evidence or go into detail on each particular matter proposed to be proved. There are sufficient substantive averments on which appellee may predicate its case and adduce testimony in support thereof. Appellants dwell too seriously on appellee's use of the words "apparent" and "likely" in referring to the consequences of the law. There could have been no doubt in appellants' mind of the charges made against the act. A moment's reflection will show that the use of the words was cautionary. They do not lessen the import of the allegations or the charges against the Act, nor detract from the inferences to be drawn therefrom, and the effect thereof on appellee's railroad system from an operating and financial standpoint. Principally, the bill charged that the legislation would deprive appellee of property without due process of law in violation of the Bill of Rights of our Constitution, and the Fourteenth Amendment to the Federal Constitution, in that the regulations are arbitrary and unreasonable, and not in furtherance of the purpose stated in the title of the Act. The requirements were also stated to impose an undue burden on interstate commerce.

Appellants contend, however, that the Full Crew Law is a valid exercise of the police power and does not offend these constitutional provisions. They maintain it is not unreasonable or arbitrary and bears reasonable relation to its ostensible object, to-wit, the promotion of

the safety and welfare of employees and the traveling public. Obviously, this controversial issue required a further hearing on the merits, and the constitutionality of the Act was sufficiently challenged to justify summary relief pending that hearing. This is particularly true because of the penalties provided by the Act for noncompliance.

The Full Crew Law went into effect immediately on its passage and provided that the railroad, its officers and agents should pay $100 for each violation. The bill shows, that, considering the number of additional men to be employed, the penalties for noncompliance would be at least $200,000 a day for this appellee alone. The penalty provision of the Act clearly causes persons affected thereby to come within the protection of our Bill of Rights and the due process clause of the Federal Constitution. See *Oklahoma Operating Co. v. Love,* supra; *Wadley Southern Ry. Co. v. Georgia,* 235 U. S. 651; *Ex Parte Young,* supra. To be of any substance this right must not be burdened or impinged by the overhanging threat of heavy penalties exceeding far the cost of obedience. Appellee, as it has pointed out, was at the outset faced with two alternatives, either that of complying with the Act and expending large sums of money which it could never recover even if the Act should be ultimately held invalid, or of ignoring the Act, and incurring heavy penalties which also it might never recover. The remaining possibility and obviously the only just and proper one under the circumstances is to have the enforcement of the Act restrained pending determination of the question of its validity. On principle of fairness and equity every citizen has a right to judicial review of the constitutionality of legislation which it is alleged takes from him without compensation his property, and he has the further right to have that question determined before these rights are swept from him. Any court denying this great prerogative denies the most elementary principle of justice. The opposite rule

is that of absolutism in legislative or executive bodies, which cannot be accepted.

It is argued that it was error to grant the preliminary injunction pending a hearing of evidence in support of the bill, because the constitutionality of the Act was apparent on its face, and should have been decided as a matter of law. Reference is made to the decisions of this Court in *Suermann et al. v. Hadley et al.*, 327 Pa. 190, and *Stewart et al. v. Hadley*, 327 Pa. 66. The legal issues in those cases arose solely from statutory interpretation and not from factual considerations. The issues were evolved from the acts themselves. But this challenge against the constitutionality of the Full Crew Act depends entirely on facts. We cannot determine whether the Act is confiscatory, unreasonable and arbitrary, or whether it does not reasonably tend to promote safety, until facts are presented to show the existence of any of these effects. Prima facie, the Act is valid and must be so considered by us until its invalidity appears. Whether the measure promotes safety, or has a tendency to do so, must indubitably turn on facts and circumstances regarding that subject, and the relation which the provisions of the Act bear to safety. An analysis of the statute and the statute's requirements is necessary; we must compare these with the incidents of transportation, including the causes which create the need for safeguards, and the methods now employed to obtain the safety of the public and employees. When the result is reached, if it is found the statutory protection is of such slight consequence, or is so incidental as to cause the provisions of the Act to be wholly impractical, and not in promotion of the safety it seems to strive for, then its operation would be unreasonable and arbitrary. This situation could only be developed by evidence. In these circumstances, of course, it would be error to refuse to hear evidence: *Borden's Co. v. Baldwin, Commr. et al.*, 293 U. S. 194; *Chastleton Corp. v. Sinclair et al.*, 264 U. S. 543; *Harrisburg Dairies v. Eisaman*, 328 Pa. 195.

Of course, if we accept the Commonwealth's view of legislative absolutism, and conclude, with it, that the determination of the legislature as to what steps are necessary to secure safety is final and conclusive, then no evidence should or could be received on the question of the Act's reasonableness. If we are to assume that any increase in the number of employees on a train insures safety, per se, regardless of any other consideration, then all such legislation is valid regardless of its consequences to the railroad, its travelers and the public in general. Safety is a relative term. Absolute safety can never be insured, and comparative safety is attended by certain necessary elements of disadvantage which must enter the comparison. One of these elements is cost, and it must be considered.

Cost reflects not only the expense of compliance in dollars and cents to the railroad but, more important, bears on the ultimate expense to the public at large which uses its facilities. The cost of complying with state laws enacted to promote safety is an important element in determining whether the law is arbitrary and unreasonable: *Missouri Pac. R. Co. v. Norwood*, 283 U. S. 249, at 255. The Supreme Court of the United States in an opinion by Mr. Justice BRANDEIS, *Nashville, C. & St. L. R. R. Co. v. Walters*, 294 U. S. 405, 429-430, reversed the state court for failure to consider evidence submitted to show the cost of compliance with a regulatory statute, challenged under the due process clause. The state court had held, as the Commonwealth here contends, that the statute on its face was a constitutional exercise of the police power, and since the legislature's determination of the wisdom of the measure was final, courts could not consider whether the Act was burdensome or unreasonable in its application to complainants. This position was repudiated by the Supreme Court. Appellee's evidence shows that it will cost the railroad about $4,500,000 annually to carry out the provisions of this Act in the State. It is urged, not

without merit, that the speculative advantage to safety through the introduction of additional human agencies is so highly problematical and uncertain, that the expenditure of this sum each year for that purpose out of the net annual income for the Pennsylvania region is unreasonable and arbitrary.

Appellee operates in five or six states. The bill avers that the Full Crew Act would so deplete appellee's revenues that not only would the return on the investment be jeopardized, but its resources would be so seriously diminished and crippled as to impede its successful operation as an interstate carrier. Interstate commerce may be prejudiced in many ways by arbitrary state regulation, for where the expenditures are from a common fund, to be applied in several states, and grossly imposed upon for local interest, the ability of the carrier to properly serve interstate commerce is greatly lessened, and its financial structure is so weakened that it cannot provide proper, adequate or safe transportation facilities without prohibitive rate increases.

It is true that in *Missouri Pac. Ry. Co. v. Norwood,* supra, it was stated that as long as Congress did not invade the field of full crew regulations, the states would be permitted to make *reasonable* enactments thereon, but it cannot be overlooked that where state laws materially and unreasonably affect the revenues which go to build up interstate commerce, the Federal Constitution must operate as a check, otherwise state regulation may be such as to sweep away the commerce clause of the Constitution by becoming so onerous that its inevitable effect must be to burden, cripple and injuriously affect commerce between the states. When state laws destructively approach this exclusive sphere of Federal control, it is then that supervision by the commerce clause must become effective, otherwise local regulation will become the rock upon which all interstate commerce power will break. The public is entitled to an efficient system of transportation, and if one portion of its elements is

overloaded with expense to the detriment of other parts, the natural result must follow, a breakdown in the system to the great disadvantage of the entire public. This important consideration should never be overlooked. Today the railroad transportation system of America, faced with automotive competition, has reached the point where its financial position is precarious. This fact must be considered in determining the relative cost to appellee of compliance. To impose a drastic, heavy burden upon the railroads at this time, may react inimically to the public's interest and to the interest of railroad employees as well.

Nor does the case of *Pennsylvania R. R. Co. v. Ewing*, 241 Pa. 581, control the instant case in such a way that it was error to grant the injunction pending a hearing. In that case this Court sustained the Full Crew Act of June 19, 1911, P. L. 1053. The Act of 1937 now under consideration differs not only from our first Full Crew Act, but differs from every other act in any state.[1] Ap-

---

[1] The Act of 1911 made the following requirements: (1) Any freight train of more than 30 cars must have a crew of 6: engineer, fireman, conductor, flagman and two brakemen (Section 1); (2) freight trains of less than 30 cars, a crew of 5: engineer, fireman, conductor, flagman and brakeman (Section 2); (3) passenger trains of 3 cars with one baggage car, a crew of 5: engineer, fireman, conductor, baggageman, flagman (Section 3); (4) passenger trains of more than 4 cars with one baggage car, a crew of 6: engineer, fireman, conductor, baggageman, brakeman, flagman (Section 5); (5) trains of 4 or more passenger, express or mail cars, a crew of 5: engineer, fireman, conductor, brakeman, flagman.

Briefly, the provisions of the Act of 1937 are as follows: Section 1 defines the terms to be used. Section 2 provides that each passenger train shall be manned by a crew consisting of engineer, fireman, conductor and brakeman for every five cars, with one additional brakeman when there are more than five or where there are ten cars, none of which carry passengers. Section 3 provides that freight trains of less than 50 cars shall have a fireman, engineer, conductor and two brakemen. Section 4 provides that freight trains of 50 cars or more shall have an additional brakeman. Section 5 requires a crew of fireman, conductor, engineer and three

pellee insists its terms are more sweeping, and its effects more drastic and onerous. Some of the requirements are new to Pennsylvania, and some have never been considered by the Supreme Court of the United States in any case. Furthermore, the record shows that conditions upon which the Act must operate have changed since 1911. It is well settled that where a law depends upon the existence of a certain set of facts to uphold it, if the facts change, then, though valid when passed, it may be invalid under the altered facts and circum-

---

brakemen on any freight train doing switching or unloading. Section 6 provides that all other trains shall have at least one engineer and one fireman. Section 7 provides that yard locomotives used to handle or switch cars shall be manned by a crew of engineer, fireman, yard conductor or foreman and two yard brakemen. Section 8 provides that any locomotive operated on the main tracks shall have one engineer, one fireman and one conductor or brakeman. Section 9 makes the same provision for self-propelled cranes, hoists and pile drivers. Section 10 permits the operation of a train short-handed if a member of the crew becomes disabled between terminals and until he can be replaced. Section 11 imposes a penalty of $100 for each violation of the Act and exempts manufacturers' trains of certain types from the operation of the statute. Section 12 entrusts the Public Utilities Commission with the enforcement of the Act. Section 13 states that the provisions are severable. Section 14 is a general repeal clause and Section 15 provides that it shall take effect immediately upon its adoption.

Appellee points out that Section 2 requires a motorman's assistant on suburban electric trains, and a second brakeman on any trains of five cars or more, one of which carries passengers. It also construes that section to require a second brakeman on trains of *empty* passenger cars of 10 cars or more in length, and a baggageman in "locked" baggage. Section 4 will require a third brakeman on "through" freight trains of 50 cars or more; and Section 5, a third brakeman on "local" freight trains regardless of length. The switching crew provisions of Section 7 are new to this State, and apparently go further than those of the Arkansas act which were limited to switching operations within municipalities of the first and second class. Also novel, appellee states, are the provisions of Section 8 which would require a conductor or brakeman on single or light engines, and a full engine crew on the second of two coupled locomotives being operated together.

stances: *Chastleton v. Sinclair,* supra; *Newton v. Consolidated Gas Co.,* 258 U. S. 165; *Nashville, C. & St. L. R. R. Co. v. Walters,* supra. Where there has been such a change in relevant conditions, and a statute is challenged on the ground of its unconstitutionality as applied to the new facts, evidence must be admitted to sustain the challenge. The Supreme Court said in *Nashville, C. & St. L. R. R. Co. v. Walters:* "A statute valid when enacted may become invalid by changing conditions to which it is applied. The police power is subject to the constitutional limitation that it may not be exercised arbitrarily or unreasonably. Unless the evidence and the special facts relied upon were of such nature that they could not conceivably establish that the action of the State [was] . . . arbitrary and unreasonable, the State Supreme Court obviously erred in refusing to consider the evidence." The span of years has marked revolutionary changes in transportation. What may have been necessary for safety in 1911 may not be necessary today. Furthermore, the question of costs of compliance under the present statute, compared with the cost under the Act of 1911, is very important. In 1911, full crew regulations required this appellee to expend approximately $484,000 annually. Competition today from the different modes of transportation has resulted in a great depletion of revenues to rail carriers, yet with these diminished revenues the cost of appellee's compliance with the Act of 1937, in Pennsylvania alone, is alleged to be over $4,500,000 per year. There was no alternative for the court below but to consider the testimony. The *Ewing* case is not controlling.

Appellants contend, however, that the evidence presented at the hearing to continue the injunction did not support the allegations of the bill and establish a prima facie case entitling appellee to a continuance of injunctive relief. Unquestionably, the burden was on appellee to show in what way the Act, in its application to its system, would violate the Federal or State Constitu-

tions. As appellants urge that there is nothing in the evidence to show the Act to be arbitrary or confiscatory, and that the Act has a reasonable relation to a lawful purpose, in ascertaining whether the court was within its powers in continuing the injunction, we will review the record in its entirety to ascertain if appellee has carried the burden of showing not only that the Act has, prima facie, no reasonable relation to safety, but is oppressive, arbitrary and confiscatory, and therefore that the court did not err in continuing the injunction.

In ascertaining whether the burden has been carried, we will consider appellee's evidence of the state of its property, its methods of operation and all the measures adopted by it to promote safety, comparing these factors as they existed under the Act of 1911 and the Act of 1937. The evidence shows a remarkable advance in all departments which make for better railroad operation. If these improved conditions, while reducing the cost of carriage, have also insured greater safety in travel, there is no reason why appellee should not receive the benefit of such efforts in a consideration of the Act.

The record as it at present stands shows that there have been a number of major changes in the entire scheme of railroad building, equipment and operation since 1911, all designed to increase safety. The progressive decline, as appears from the exhibits, in the number of injuries and deaths,[2] establish the conclusion that they have had this effect, and appellee argues that a railroad may not constitutionally be required to spend

---

[2] In this State in the year 1920 when the first Full Crew Act was in effect there were 203 deaths of employees on the appellee's system. From 1931 to 1936 inclusive, the yearly average was 26 deaths. The number of injuries show a remarkable decline, from 4,000 in 1915, to 260 in the six-year average of 1931 to 1936. In 1920 this appellee had 15 passengers killed. From 1931 to 1936, a six-year average, there were two deaths. In 1920 it had 169 passengers injured and during the six-year period, yearly average, from 1931 to 1936, it had 80. In other words, while business declined, the number of deaths and accidents shows a greater decline.

over four and a half million dollars a year for the speculative possibility of preventing a half dozen injuries of a minor character.

Safety in every field depends upon the hazards involved and the steps taken to ward off the untoward events which produce casualties. If all the avenues of danger are safeguarded the goal of absolute safety is more nearly approached. It has been urged that in most instances mechanical appliances afford more dependable safeguards than reliance on the human equation, and from the record it appears that appellee has practically rebuilt its entire system with new and expensive mechanical devices calculated to produce safety. The cost of this program for appellee's entire system is stated to exceed $280,000,000, of which approximately $122,-000,000 was spent in this State. Largely responsible for the great decrease in passenger and employee injuries were the improvements in automatic signal devices.[3] These signalling devices have greatly reduced the need for hand signalling by members of train crews, and appellee's witnesses predicted that soon no flagging would be required. This casts doubt on the wisdom of adding additional men to the crews for the purpose of signalling and protecting trains.

In the field of track and roadbed improvements many important steps have been made to protect the safety of the users of the railroad.[4] Obviously this program of

---

[3] The automatic block signal system was inaugurated in 1906. In 1937 this system had been extended throughout the entire network of the railroad, protecting 85% of all passenger mileage and 70% of the freight mileage. Its extent is more than three times greater than it was when the Full Crew Act of 1911 was adopted. A more recent development, the cab signal, was adopted fifteen years ago and is now widely used.

[4] Since 1920, rail failures on appellee's road declined from 15,680 to 5,002 in 1936, due to the introduction of better and heavier rails and intensified track inspection. In 1913 the majority of rails used weighed less than 100 lbs. per yard, none weighed more; today the greater number weigh 130 lbs., and above eighty per cent

roadbed safety has reduced the hazards to passengers and train crews from this source.

During the two decades that have passed, all of the wooden bridges on the main tracks of the road have been replaced with steel and concrete, and dangerous clearances have been removed. Between the years 1913 and 1936 the railroad installed interlocking devices to protect train routes over switches and crossovers. These combined with automatic detectors for dragging equipment, adopted in 1936, are designed to protect against running accidents from these causes. Finally, dangers attendant upon rock slides have been met by the erection of slide protection fences which give automatic signal warnings when slides occur. This is a comparatively recent development in transportation safety, and has been in use by appellee since 1926. These automatic devices perform services hitherto forming part of the duties of railroad employees, and they contribute to obviate the necessity of the additional employees required by the statute.

In other fields corresponding steps have been taken to eliminate accidents. Notably, appellee's witnesses testified to improvements in car construction and rolling stock tending to promote safety.[5]

are 100 lbs. or more in weight. Beginning in 1913, the use of ties treated to minimize rotting and prevent constant replacements was inaugurated. Roadbed ballast has been made wider and deeper in the past twenty years to protect against side slip, reduce vibration, and make the ties secure. Devices for mechanical cleaning of ballast have been used since 1922. For eight years extensive improvements have been made in roadbed drainage to reduce the possibility of the track settling.

[5] The substitution of cast-steel side-frames for more complex arch-bar trucks began in 1928, and brake-beam safety supports were adopted in 1930 to prevent dragging equipment. On so-called hopper-cars, new drop-door latches were installed to prevent accidental discharge of lading on the track during operation of the train. This device was first used in 1926. Beginning in 1916 better coupling plates and top angles were employed on hopper-cars

At the time that the Act of 1911 was adopted, many diverse types of car couplings were in use, and many injuries occurred from defects in this equipment. A new coupler, designed to withstand greater strain was adopted in 1916, and further improvement was made in car couplings in 1933. Draft gears, or coupling shock absorbers, were vastly improved in 1932 to minimize jolts from the start and stop of trains.

Significant advancements have also been made, according to the testimony, in the type of air brakes utilized on appellee's trains.[6]

Among the general improvements in rolling stock construction may be mentioned the innovations in hand holds, grab irons, ladders, and steps which were adopted to promote the safety of crew members. Changes in locomotive design have aimed at improving the vision of the operator, and simplifying the task of the fireman and stoker. Roller bearings have replaced journal boxes on many engines and passenger cars, reducing the possibility of hot boxes.

These constant improvements in the equipment of appellee must be considered as having a definite bearing on the question of whether or not the provisions of the Full

---

to prevent bulging of the sides and buckling. In 1934 and 1935 appellee destroyed all wooden box cars. From 1911 on, rolled steel wheels were used instead of cast iron wheels on freight cars, while a new process of heat treatment was developed to make safer the wheels of passenger cars. This latter development was first put in use in 1930.

[6] The H-brake in use at the time the Act of 1911 was passed could not be applied without causing a severe jolt or jar. In 1915 the K-brake was developed which resulted in smoother checking. In 1933 the AB-brake, employing a new principle, was perfected and is being substituted for the K-brake. The design of these improvements is to minimize the injuries caused by sudden stops, and to prevent the breaking of couplings. Improvements have also been made in the means for stopping freight trains from the rear-end cabin in cases of emergency.

114

Crew Act are reasonable. Appellee has also advanced proof of forward strides in inspectional methods.[7]

To these devices and methods appellee attributes a vast reduction in the inspectional duties of operating crews. This, also, is a matter for proof and fact-finding. In addition, more stringent rules respecting the conduct of employees have been put into effect to reduce accidents. For example, when the Act of 1911 was passed, brakemen usually rode on top of the cars, today because of improved brakes this is generally unnecessary, and it is now in most cases against the rules for freight brakemen to ride in this way. They are usually carried in the cabin or in the engine.

Relating all of these contentions to the specific requirements of the Act of 1937, it appears that there is now no need for the additional brakeman required on a passenger train of 10 or more "deadhead" cars under appellee's construction of Section 2, and of a baggageman in a locked baggage car, under its interpretation of that section. It is also shown that there is no safety purpose to be served by the requirement of Section 2 for a motorman's assistant on multiple unit suburban electric trains. The need for an extra brakeman on passenger trains of 5 or more cars under Section 2 is likewise shown as useless. The same situation is shown concerning the third brakeman required by Section 4 on all freight trains of 50 or more cars. The requirement of a third brakeman on local freight trains doing switching irrespective of the numbers of cars (Section 5); of two

---

[7] A periodic inspection and overhauling of freight cars once every 15 months was introduced in 1926. Passenger cars receive general inspection every 12 months. In appellee's principal yards, inspection pits were installed in 1931, to enable observation of the gear and under-equipment of freight cars. Side inspections are made at every yard. A device was developed in 1926 to facilitate the testing of journal boxes to disclose the existence of matter likely to produce hot boxes. This was an advancement on visual inspection. Similarly a device for testing air brakes came into use in 1925, which made such inspections safer and more efficacious.

brakemen on all switching or yard crews (Section 7); and of three brakemen on such crews when operating over city streets (Section 7), are unnecessary and arbitrary. Finally, it appears that there is no need for a conductor or brakeman on single, or light locomotives, as prescribed by Section 8, nor by the provision of that section for an additional engine crew on the second of two electric locomotives coupled together. While appellants contend that many of these apparent requirements result from appellee's misconstruction of the Act, thereby raising issues of law, appellee's witnesses have given testimony concerning them which show that they have no relation to the purpose of the Act. The evidence was sufficient to sustain the continuing of the injunction.

Appellants insist that even if the grant of the preliminary injunction may have been warranted, since appellee's evidence is all in, this Court should view this proceeding as on final hearing and decide the merits of the controversy. This would be a most unusual proceeding, clearly contrary to anything ever heard of in practice, as the evidence is not all before us. These factual issues above pointed out are determinative of the basic issue of constitutionality, and this Court cannot undertake to dispose of that question before a final hearing and the presentation of appellants' case. The evidence so far as it has gone shows that appellee has fully met and carried the burden and the court did not err in continuing the preliminary injunction. On the record as it now stands, the injunction would have to be made permanent, but defendants have not been heard and the record will have to be returned for further hearing. It is for the court below to determine the questions of fact involved and their effect upon the duties of those charged with the operation of the trains, when the evidence is all taken. We review the record as now presented determining the question from the viewpoint of continuing the injunction.

Remanded with a procedendo.