Robinson Township School District *v.* Houghton
(et al., Appellant).

Argued October 3, 1956. Before STERN, C. J., JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Louis D. Cooper*, with him *Cooper, Hunter & Lewis*, for appellant.

*Franklin Blackstone, Jr.*, with him *Paul, Lawrence & Rock*, for appellees.

OPINION BY MR. JUSTICE JONES, December 29, 1956:

This case arose in the court below on the petition of the School District of Robinson Township, Allegheny County, for a declaratory judgment. Impleaded as parties defendant were two named individuals in their personal capicity and as trustees ad litem for the Taxpayers' League of Robinson Township. After answer filed, an agreed-upon statement of facts was entered of record in the form of a case stated wherein a right of appeal was reserved to the *petitioner* and the *respondents*.

The question of law posed for the court's decision was whether the board of directors of the school district possessed *discretionary* power to transport in buses of the school district, to the site of the public school, non-public school pupils who, while of compulsory school age, attend schools other than the public school of the district.

The court en banc, consisting of three judges, unanimously held that the plaintiff school district was without power, discretionary or otherwise, to transport non-public school pupils in public school buses since the powers of a school board in cognate relation are derived from statutory authority and the School Code does not authorize a school district's transportation to and from its public schools of any pupils other than *public school* pupils. See *Connell v. Kennett Township Board of School Directors,* 356 Pa. 585, 589, 52 A. 2d 180, where we affirmed, *per curiam,* on the lower court's well-considered construction of the pertinent provisions of the School Code relative to the free transportation of pupils to and from public schools.

The suggested distinction between the *Connell* case and the instant case fails to point a legal difference. It is of no material significance to the principle involved that, in the *Connell* case, the plaintiff-parent claimed that there was a mandatory duty on the school district to provide his school-age child with free transportation to and from her non-public school while the instant proceeding merely sought court approval of the school board's willingness to transport non-public school pupils in public school buses where that could be accomplished without apparent expense to the school district. The matter of the expense to the taxpayers of the school district for the free transportation of non-public school pupils, which was averred in the

*Connell* case as constituting a violation of Article X, Section 2 of the State Constitution, played no part in the decision in that case. The matter of alleged expense was expressly not passed upon in view of the *ratio decendendi* that there is no authority in the School Code for a school board's transportation of non-public school pupils in school district buses.

And, accordingly, the court below entered the following judgment in the instant case: "That the transportation of non-public school students in public school owned buses is *ultra vires* as unauthorized under the provisions of the Public School Code of 1949." The present appellant, as an ostensible intervenor, brought this appeal.

The appellant, totally ignoring the primarily controlling question of law as to the scope of the School Code in the premises, irrelevantly enters upon a discussion as to whether the proposed transportation by the plaintiff school district of non-public school pupils would violate Article X, Section 2 of the Pennsylvania Constitution which provides that "No money raised for the support of the public schools of the Commonwealth shall be appropriated to or used for the support of any sectarian school." On the assumption that such transportation of non-public school pupils would not violate the cited constitutional provision, the appellant asserts that the school board consequently possesses *discretionary* power to permit non-public school pupils to be transported in public school buses under the circumstances here averred. A more patent non-sequitur would be hard to imagine. Article X, Section 2 is a negative restraint and not a positive authorization to anyone to do anything.

The constitutional question, which the appellant thus tried to inject, is simply not in this case; and, the

majority of the court en banc advisedly disregarded it. Orderly judicial procedure requires that nothing more be passed upon by a court than the justiciable question posed for its decision. Beyond that, there is the further familiar principle that a court will not pass on a constitutional question unless it is absolutely necessary to do so in order to decide the case before it: *Commonwealth, to use v. Picard,* 296 Pa. 120, 124, 145 A. 794; see, also, *Sablosky v. Messner,* 372 Pa. 47, 60, 92 A. 2d 411; *Altieri v. Allentown Retirement Board,* 368 Pa. 176, 180, 81 A. 2d 884. The court below, therefore, correctly refrained from expressing any opinion on the constitutional question which the appellant sought to raise; and we necessarily do likewise. Whether a school district's transportation of non-public school pupils to and from the site of its public school in public school buses would constitute a violation of Article X, Section 2 of the State Constitution cannot properly come before us until the legislature authorizes or permits such a practice and the constitutionality of its action is directly called in question in a due judicial proceeding.

In any event the appeal must be quashed. Paul A. Stinner, the nominal appellant, lacked standing to appeal.

Six weeks after the case had been finally disposed of by the court below, Stinner and one John Macek filed a joint petition seeking leave to intervene in the proceeding, praying, inter alia, that they be accorded the rights reserved to the original parties to the action with respect to taking an appeal from the final order entered in the proceeding. The court below, in asserted reliance on Rule 2327 of the Rules of Civil Procedure, as authority for its action, entered an order as prayed for. The same day, Stinner, acting alone, took

the instant appeal from the judgment theretofore entered in the proceeding, and the court below, on Stinner's further petition, entered an order of supersedeas to the judgment.

The order allowing the petitioners to intervene in the instant case was plainly improvident. Rule 2327 of our Rules of Civil Procedure prescribes that intervention may be had "during the pendency of an action." And, there was no action pending at the time the intervention was allowed. Pendency, in practice, has been said to be "the state of an undetermined proceeding": 70 C.J.S. 420. Black's Law Dictionary, 3rd Ed., p. 1345, defines the term as "the state of an action, etc., after it has been begun, and *before the final disposition of it*" (Emphasis supplied). In *Rea v. Klein,* 14 Wash. 82, 83, the court pertinently stated that "In all of the cases which we have examined, in which the right to intervene has been allowed, there was a proceeding pending, with further steps to be taken before this was concluded." The action in the *Rea* case having terminated in the entry of a judgment whereon execution had been issued, it was held that "There was no proceeding pending, in which the parties could intervene." The correct interpretation of Rule 2327 is, as stated in Standard Pennsylvania Practice, Vol. 2, Parties, §97, p. 429, that "After adjudication, a petition to intervene is too late", citing *Collins v. Martin,* 30 Dauph. 33, 34. In that case the petitioner did not offer to intervene until after the proceeding had been adjudicated by the court. The application was consequently held to be untimely. Cf. also *De Lucca's Liquor License Case,* 124 Pa. Superior Ct. 500, 509, 190 A. 195.

We are aware that each of two commentaries on our Rules of Civil Procedure expresses the opinion that,

for the purpose of intervening, an action is pending from the moment it is first brought until the record of the action is removed on appeal. Neither cites any authority for the dictum whose inherent error is patent, upon a moment's reflection, and does not require further discussion. In this connection, it is not inappropriate to note that the right of appeal from the action of a lower court is *not* constitutionally ordained in Pennsylvania. With us, such right is conferred *solely* by statute and does not otherwise exist.

The petitioners did not, moreover, come within the provisions of Rule 2327, qualification under one of its four categories being a condition precedent to the granting of leave to intervene. They did not have such an interest that they could have joined as original parties to the action and could not have been joined therein within the contemplation of subdivision (3) of Rule 2327 for the very patent reason that they did not have a *legally enforceable interest* in the subject-matter of the controversy within the intent of subdivision (4) of Rule 2327: see *Connell v. Kennett Township Board of School Directors,* supra. And, of course, it is too plain for discussion that neither subdivision (1) or (2) of Rule 2327 furnished the petitioners with any basis for intervening.

The undeniable fact is that the litigation initiated by the declaratory judgment petition was conclusively determined by the court below, and a final judgment entered therein before the petition for intervention was ever filed. Intervention was, therefore, no longer allowable. Nor need Stinner be troubled by the thought that, in some future litigation, he may be met with a plea of *res judicata* on account of the final order entered herein by the court below. *Res judicata* as is generally known, binds only parties to the conclusive

proceeding. So long as one is not a party thereto, he need have no fear that he will be concluded thereby. For Stinner now to be effectively excluded from the proceeding—a status which our order will confirm— assures his freedom from any binding effect of the order entered by the court below. See also Section 11 of the Declaratory Judgment Act of June 18, 1923, P. L. 840, 12 PS §841.

The order of supersedeas is vacated and the appeal quashed.

Mr. Justice BELL would affirm the order of the lower court on that part of the opinion of Mr. Justice JONES which ably deals with the merits of the case.

————

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The School District of Robinson Township owns seven auto buses which it uses in transporting children from their homes to the public schoolhouses in the Township. In proceeding to their various destinations the buses pass certain points where parochial school children are picked up and taken to other points close to the parochial schools they attend, without deviation from the pre-appointed route of the bus involved. Each school day the buses transport 821 public school children and 43 non-public school children.

Some persons and an organization in the Township having complained that the School District had no authority to heed the requests of waiting children along the path of travel of the school buses, the School District petitioned the Court of Common Pleas of Allegheny County for a declaratory judgment to the effect that "the incidental transporting of non public school children in public school owned buses is not in viola-

tion of Article 10, Section 2 of the Constitution of the Commonwealth of Pennsylvania." The Court below, after argument and due consideration, dismissed the petition with the statement that "the transportation of non-public students in public school owned buses is ultra vires as unauthorized under the provisions of the Public School Code of 1949." The defendants in these proceedings were Vernon Houghton and Ola Gordon, individually and as trustees ad litem for the Taxpayers League of Robinson Township.

The case stated, upon which arguments were made, contained a provision, with regard to appeal, as follows: "The right to appeal from any court decision by either Petitioner or respondent is herein reserved."

Two citizens of Robinson Township, Paul A. Stinner and John Macek, fathers of non-public school children, with an interest of no less relevancy and intensity than that which animated the named parties, petitioned the Court to intervene. The Court granted the petition, whereupon the intervenors appealed here from the denial of the declaratory judgment.

The Majority of the Court has now decided that the petitioners do not have a "legally enforceable interest" and has quashed the appeal. It is not clear from the Court's decision whether the petitioners are adjudicated without interest because, under the Court's view of the matter, *no one* could have an interest in what the Court says cannot be done, or whether the Court means that the petitioners are without interest to take the appeal because of certain unnamed technical requirements.

Rule 2327 of the Pennsylvania Rules of Civil Procedure provides: "At any time during the pendency of an action, a person not a party thereto shall be permitted to intervene therein, subject to these rules . . .

(3) such person could have joined as an original party in the action or could have been joined therein; or (4) the determination of such action may affect any legally enforceable interest of such person whether or not he may be bound by a judgment in the action."

The petitioners certainly come within Clause (3) above quoted because there can be no doubt that Paul A. Stinner and John Macek could have joined in the original action. Obviously it was not necessary for them to participate in the Complaint because the case could proceed to an orderly termination without their inclusion in the action. However, after the lower Court had spoken and the School District took no appeal, it then did become necessary, in fact imperative, that the petitioners intervene in order that their rights might be adjudicated by the highest Court in the Commonwealth. Stinner and Macek accordingly applied to the Court below for the right to intervene, and the Court, in the exercise of its discretion, granted the petition. This Court cannot now invalidate the granting of that petition unless it shows that the lower Court abused its discretion. This Court has not done that, nor do I believe it can do so. Instead of even attempting to show an abuse of discretion, however, this Court arbitrarily declares that the petitioners had no "legally enforceable interest," ignoring completely clause (3) of Rule 2327 which guarantees to any person the right to intervene if he could have joined originally in the action.

This Court also holds that the petition to intervene was filed too late because judgment had already been entered when the petition appeared. This, however, is not the criterion which determines the timeliness of a petition. The commentary on Rule 2327 in Standard Pennsylvania Practice, Goodrich-Amram, under the

title "Time for Intervention", says, inter alia: "Under these rules a person may intervene 'at any time during the pendency of the action.' For this purpose, an action is pending from the moment it is first brought *until the record of the action is removed on appeal."*

Ronald A. Anderson, who is Chief Research Assistant and Secretary of the Procedural Rules Committee of this Court, says in his monumental work "Anderson, Pennsylvania Civil Practice," on the subject under discussion: "Intervention may be allowed at any time during the pendency of an action. It is immaterial whether it is before or after trial or *even after the entry of judgment as long as the record has not yet been removed on appeal."*

The Majority Opinion dismisses these distinguished authorities, who have devoted countless years to the study of this very subject, with the brusque remark that: "Neither cites any authority for the dictum whose inherent error is patent, upon a moment's reflection, and does not require further discussion."

A moment's reflection, or even a month's reflection does not reveal the "inherent error" which seems so apparent to the Majority. And it is a matter of sober reflection that the Majority feels that so momentous a subject as that which is before us for consideration does not merit "further discussion." Nothing less than the constitutional right of appeal is on the scales of determination. That right is one of the most formidable pillars upholding the temple of organized law. Denying the opportunity to correct errors which may have occurred in lower Court proceedings is to remove a support which can bring the whole temple of the law crashing to the ground amid the dust of irresponsibility and the debris of utter chaos.

The Majority says that: ". . . the right of appeal from the action of a lower court is *not* constitutionally ordained in Pennsylvania. With us, such right is conferred *solely* by statute and does not otherwise exist." (Italics in Majority's Opinion.) This is an amazing statement. It suggests that the right of appeal is a grace which the sovereign power may or may not allow. It is impossible to believe that under our system of law, any person who considers himself aggrieved by the decision of a court of original jurisdiction may not ask for a review of some kind. In *Clarke's Case,* 301 Pa. 321, 326, this Court said: "Among the incidents of a court of record is the litigant's right of appeal in some form, unless it is specifically denied." In that case the right of review was that by certiorari even though the right involved was of statutory origin and no right of appeal was expressly provided for.

In *Penna. R. R. Co. v. Driscoll,* 330 Pa. 97, 103, we said: "On principle of fairness and equity every citizen has a right to judicial review of the constitutionality of legislation which it is alleged takes from him without compensation his property, and he has the further right to have that question determined before these rights are swept from him. *Any court denying this great prerogative denies the most elementary principle of justice.* The opposite rule is that of absolutism in legislative or executive bodies, which cannot be accepted."*

This statement of our Court in 1930 is the complete answer to the Majority's statement here that the right of appeal can exist only by statute, because there is no statute which says that "every citizen has a right to judicial review of the constitutionality of legislation which it is alleged takes from him without compensa-

---

* Italics throughout mine, unless otherwise indicated.

tion his property." The fundamental right to appeal in such a situation comes not from a statute but from the "principles of fairness and equity" and the constitutional provision that private property may not be taken "without just compensation."

Even if, however, we were to admit for argument sake *alone* that the right of appeal is purely statutory, the Majority's refusal to allow the appeal here would be arbitrary because under the very Uniform Declaratory Judgments Act of June 18, 1923, P. L. 840, Sec. 7, "All orders, judgment, and decrees under this act may be reviewed as other orders, judgments, and decrees. (12 PS §837).

The defendants themselves, who contested the present action stoutly and vigorously from the beginning, never questioned the right of the intervenors to intervene or appeal. They did not complain about the entry of the order granting intervention or seek to have it reversed.

The Majority errs when it says that the appeal was tardily filed. It was taken within the time allowed for appeal and before the records had been removed from the lower Court. What more could the petitioners have done in order to get the eye and the ear of this Court in a matter of vital concern to them?

After what the Majority has decided here, how can the problem considered by the lower Court ever have appellate review? It has been noted that Paul A. Stinner and John Macek did not join in the original suit because the joinder would have been superfluous. If the School District had appealed, it would still have been unnecessary for the petitioners to formally participate in the litigation for they would *ipso facto* have gained whatever benefits might accrue to the appellants in their recourse to the higher court. However,

when the School District remained static after the lower Court's decision, the petitioners had no alternative but to intervene if they were ever definitely to know their rights.

The Majority says that Stinner need not be troubled about his rights, because he can always start a fresh action. There is considerable doubt, in spite of the assurances given by the Majority, that in a new action Stinner may not be confronted with the plea of res judicata. In *Hochman v. Mortgage Finance Corporation,* 289 Pa. 260, this Court, in discussing res judicata, said: "If the relief asked in the latter bill could have been obtained in the prior action it should have been asked, and, since the cause of action is the same, all matters which might have been litigated in the former proceeding are concluded." In the case at bar the relief which would be asked for by Stinner and Macek in a new action is not only a relief that could have been sought, but it was precisely the one which the School District did pray for.

But assuming that the Majority's green signal beacon to Stinner to start afresh will not change to a red one before the case should come to us again, Stinner is still being denied a fundamental prerogative. Why should he be required to initiate a new legal action? Embarking on a sea of litigation is always an enterprise which involves the expenditure of considerable time and money, intermixed with no little apprehension as to what may happen during the journey. Stinner has already taken to sea, he has already reached the port of determination. Why must he go back, launch another ship and again commit himself to the deep on a new voyage? Why should we subject him to all the trouble, annoyance and costs of fresh litigation when we can settle the whole controversy once and

for all, right now? But more than that, what is to be happening in the meantime to the school children waiting along the road in the snow, sleet, and rain, while this Court stands by in unruffled indecision? Hamlet complained against the law's delays; a further soliloquy could well include a lament on appellate courts that require the re-doing of what has already been done, the tearing down of a building only to have it rebuilt, and the destroying of a tower which has already reached the high pavilion of judgment.

But the Majority inflicts even a greater injustice than denying an appeal. Although professing to dispose of the appeal on the ground that the intervenors never had a legally enforceable interest and that, in any event, they may begin all over again, the Court nonetheless passes on the merits of the controversy, thus sinking Stinner's new lawsuit before he can even launch it. The Majority says that the lower Court was justified in dismissing the plaintiff's Complaint because of the law laid down in the case of *Connell v. Kennett Township Board of School Directors*, 356 Pa. 585. After citing the *Connell* case as controlling the issue raised in this controversy, the Majority proceeds to argue that there is no legal difference between the principle in the *Connell* case and the one involved here. A mere glance at the *Connell* case will reveal that it is as far removed from the situation before us as Mercury is from Neptune. In the *Connell* case, Paul Connell, father of a parochial school student, sought a writ of mandamus against the defendant school directors, averring that the School Code imposed upon them a *mandatory duty* to furnish free transportation for his daughter on her way to a parochial school. In refuting the plaintiff's contention this Court said: "We hold that there is no duty, mandatory or directory,

ministerial or discretionary, provided by the School Code, which requires the defendant school boards, or any of them, to furnish free transportation for Catherine Connell to and from her residence and the Kennett Consolidated School for the purpose of her attendance at the school of which she is a pupil." Thus, it should be as clear as looking through a plate glass window that in the *Connell* case an attempt was being made to *compel* the school administration to supply free transportation to non-public-school students, whereas in the case at bar, no one is seeking to compel the school authorities to do anything.

The Majority says that the decision in the *Connell* case did not turn on the matter of expense involved. Perhaps not, but it cannot be denied that it was in the case. The Court, in pointing out that the plaintiff insisted there was a mandatory duty on the School District to supply free transportation, said: "Defendants deny that there is any such duty, express or implied, imposed upon them, or any of them, by the provisions of the School Code, and aver that *the expenditure of public monies for such purpose would be a violation of Article 10, section 2, of the Constitution of the Commonwealth.*"

In the case at bar, the School District of Robinson Township merely asked, as already indicated, that the Court declare the "incidental transporting of non-public school children in public school owned buses is not in violation of Article 10, Section 2 of the Constitution of the Commonwealth of Pennsylvania." For many years the school authorities of Robinson Township have permitted their auto drivers with empty seats in their vehicles to give rides to occasional boys and girls who were travelling in the same direction and to the same destination to which their buses were destined. This

involved no extra expense, no loss of time, no trouble of administration, and no inconvenience of supervision. The School District wished to be informed, through a declaratory judgment, that this *"incidental transportation"* did not violate the Constitution of the State.

The Majority has brushed aside this fundamental and basic question by saying that it is not in the case. Why is it not in the case? A plaintiff who asks for a declaratory judgment on the proposition that his title to the property he claims to be his own is being threatened by his neighbor cannot be shunted aside by the Court's saying that the matter of title is not involved and then proceed to dispose of the case on something entirely extraneous to title.

The incidental transporting of non-public-school children in public school owned buses is or is not in violation of Article X, Section 2 of the Constitution, which reads: "No money raised for the support of the public schools of the Commonwealth shall be appropriated to or used for the support of any sectarian school."

Instead of answering whether it is or not, this Court says that "Article X, Section 2 is a negative restraint and not a positive authorization to anyone to do anything." Using the words of the Majority I would say that "A more patent non-sequitur would be hard to imagine." The plaintiff is not asking for a positive authorization; it is not asking that it be authorized to do anything; it is merely asking whether what it is now doing violates the only constitutional provision which could possibly prevent it from doing what it is doing. Instead of answering that simple question, the Majority says that it will not pass upon a constitutional question unless it is justiciably in the case. At the risk of being monotonous about it, I can

only say that *that* is the justiciable question in the case, *that* is the very foundation of the case, *that* is the only thing the plaintiff asked for in its petition for declaratory judgment.

The Majority says: "Whether a school district's transportation of non-public school pupils to and from the site of its public school in public school buses would constitute a violation of Article X, Section 2 of the State Constitution cannot properly come before us until the legislature authorizes or permits such a practice and the constitutionality of its action is directly called in question in a due judicial proceeding."

This is a more flagrant non-sequitur than the one heretofore referred to. The Robinson Township School District is confronted with a condition, not a theory. It cannot wait until the Legislature passes an undefined Act in the unknown future on an undeclared set of facts to accomplish an undesignated result. May or may not the School District transport non-public-school children without violating the Constitution, the School Code, or any other law? That is the only question in this case, and that is the very question this Court refuses to discuss.

The Majority Opinion asserts and repeats emphatically that appellant claims the school board "possesses *discretionary* power to permit non-public school pupils to be transported in public school buses." The plaintiff School District did not in its petition so assert. It declared that: "The defendant association, through its officers have threatened to bring various legal and equitable actions against your Petitioner, and the individual members of your Petitioner's School Board, unless the incidental transporting of non-public school children is stopped." In order to avoid the vexatious, costly, and unnecessary threatened litigation, the

School District, in the best traditions of declaratory judgment procedure, petitioned the Court of Common Pleas of Allegheny County to enter a Declaratory Judgment or decree "that the incidental transporting of non-public school children in public school buses is not in violation of the laws of the Commonwealth of Pennsylvania."

There is nothing in the law of the land which prohibits the entering of such a declaratory judgment. It must be conceded that there is nothing in the Constitution which specifically prohibits the free transportation of non-public-school children. It must be admitted also that there is nothing in the School Code which specifically prohibits the free transportation of non-public-school children. In fact, there is much in the Code, by inference, to support the thesis that where no expense is involved, children of tender age shall be given (or at least not denied) transportation on public school buses.

Pennsylvania State law compels all children up to 18 years of age to attend school—not public school, but *any* school so long as it has an approved curriculum and meets other requirements. The State awards to parochial school students the same scholastic credits as those which are enjoyed by public school students. It is not, therefore, illogical to say that the State which does not differentiate between public and non-public-school students, so far as grades, promotion, and graduation are concerned, cleaves a line of distinction between them according to whether they arrive at their respective classes on a street car, a public or private school bus, an automobile, a bicycle, or on foot?

If the framers of our Constitution or the authors of the School Code intended to separate public-school children from non-public-school children to the extent

that they should never be fellow-passengers on the same school bus, they undoubtedly would have said so. In point of reality, however, not only does law and reason refute any such theory of separation but economics in good government dispels even the possibility of the idea. The huge budgets required to maintain our public school system is a matter of concern to everybody. The imperative need for the best in education for the youth of our Commonwealth convinces of course the taxpayer of the inevitability of heavy taxes to meet the expense, but it does not lessen the weight of the financial burden he must carry. Therefore, anything which can mitigate that load, consistent with maintaining the highest standards in education in accordance with our present system, is welcome to the citizenry of the State. The parochial schools which absorb a not infinitesimal percentage of the number of children of school age eases the public school budget to a not insignificant extent. Thus, for every parochial school child picked up on the road by a public school bus, so much weight is lifted from the back of the taxpayer because the maintenance of parochial schools, of course, does not depend upon school funds.

Every possible train of thought following the tracks of human history leads to the inevitable conclusion that the writers of our constitution and laws never intended, so long as the taxpayers were not subjected to expense, that agents of the State should be prohibited from doing what is urged on every page and in every book of righteous living in a righteous society, namely, to help the distressed, bind up the hurts of the wounded, give direction and light to the stranded, and lend a hand of assistance to children everywhere and at all times. From time immemorial, aiding a traveller on the road has always been regarded as one of the highest

types of approved conduct—moral, legal, and philosophical.

But from now on, according to the Majority's decision, every school bus driver must suppress a sympathetic impulse to assist with a ride the lonely child waiting at the crossroads. According to that decision, the waiting child is to be doomed to wistfully hoping but never actually obtaining the lift which would unburden his limbs and exhilarate his mind, as much as it would engladden the heart of the willing driver. According to what has been decided in this case, the majesty of the law is more dignifiedly upheld by requiring school buses to travel with empty seats than that children should be carried on the wheels of the good will displayed by the township officials who were elected by the people and who, in displaying that good will, have not in any way transgressed statutory, common, or moral law.

By its pronouncement the Majority prohibits what is not prohibited by the Constitution, and not denied by the School Code or by any other law of the Commonwealth. The Majority prohibits what is authorized by natural law which has directed and controlled human relationships down through the centuries without the need of man-made statute to support it. Natural law, as described by Corpus Juris Secundum, is the expression used by Roman jurists denoting that system of rules and principles for the guidance of human conduct which, independent of enacted law or of the systems peculiar to any one people, may be discovered by the rational intelligence of man, and will be found to grow out of and conform to his nature, that is, his whole mental, moral and physical constitution. "The term has also been employed to describe those fit and just rules of conduct which the Creator has pre-

scribed to man as a dependent and social being, and which are to be ascertained from the deductions of right reason, although they may be more precisely known and more explicitly declared by divine revelation." (52 C.J.S. 1028-29.)

The right to breathe, walk, and talk is a natural prerogative which never engaged the attention of law-givers because no act of the legislature is necessary to activate the senses of man or to set in motion his processes of thought or locomotion. Similarly, the right to be good to one's neighbor, to give a slice of bread to the hungry stranger at the gate, and to offer a ride on one's horse to the weary pilgrim on the road does not depend on royal grant or legislative fiat. Whether it be a private automobile or a public school bus, the driver of the vehicle or its owner can render assistance to the footsore boy or girl on the highway, without authorization from anyone. Of course, if the driver or the school authority can accomplish his charitable act only at the expense of someone else, a principle of man-made law does intervene and it must be respected. But there is no such man-made law in this case. It is admitted that the carrying of 43 non-public-school children as part of busloads carrying 821 public-school children per day in Robinson Township involves no expense to the School District or to the taxpayer. In the final analysis, then, it comes down to this that, denying the non-public-school children a free ride, is an act of gratuitous interference with natural law and with elementary sound judgment. The Majority, by its decision, is prohibiting the giving away of something, the retention of which cannot be of any advantage to the possessor, but which can be of inestimable benefit to the donee. The Majority is prohibiting what has never been prohibited before in the history of civi-

lization, the donation of what is one's own when the gift can do no harm but only good to the donee, the donor, and all mankind.

As I view this case, this Court should have announced that so long as the carrying of non-public-school children in Robinson Township subjects the taxpayers of the Township or State to no extra expense, it is the business of no one to interfere with the humane, sensible, and law-abiding program of the school authorities in allowing boys and girls to occupy bus seats which would otherwise go empty, and in giving transportation to children who otherwise would be compelled to plod the weary miles on foot, stay home, or subject their parents to an expense which, to the knowledge of the entire community, is entirely uncalled-for.

It must not be assumed, from what I have written, that the argument in this Dissenting Opinion is predicated only on moral law and unwritten principles of good ethical conduct, entirely unrelated to written law, decisions, and precedent. It so happens that two of our neighboring States have considered the problem we have before us and have concluded that under provisions of their respective State Constitutions, not dissimilar to Article X, Section 2 of our Constitution, their organic laws not only do not prohibit the supplying of free transportation to non-public-school children, but authorize it even when an expense to the State follows. The Constitution of the State of New York, for instance, prohibits in Article XI, Sec. 4 thereof that any subdivision of the State may aid or maintain: "any school or institution of learning wholly or in part under the control or direction of any religious denomination, or in which any denominational tenet or doctrine is taught."

In the case of *Judd v. Board of Education,* 300 N. Y. S. 1037, 1040, an attempt was made to enjoin the transportation of parochial school children on the theory that a statute which provided transportation for "all school children of school age" was unconstitutional. The Supreme Court of New York, however, in a well-reasoned opinion, declared the law to be constitutional: "It does not appear that any of the taxpayers' money, whether such taxes are paid by a parent of a pupil attending the public school or a parent of one attending a denominational school, is being used or spent to aid or maintain the denominational school in question. The school here is directly supported by the parishioners of Our Lady of Loretta R. C. Church. The school is not dependent for its support on moneys raised by taxation within the school district. The school has functioned and can function without such support. The test is whether the parochial school would stand to gain or lose if no means of transportation were afforded its students? It would not. Its pupils are legally bound to attend school while they are of school age and although it would inconvenience them to some extent, they would continue to attend said school in all probability. It must be borne in mind that many children attended parochial schools long before the section of the Education Law in question was amended to provide for their transportation. Therefore, applying this test it can readily be seen that the service afforded by this amendment to the law is distinct and independent of the school itself and is intended solely for the convenience of the pupils and to promote their education, and is not 'aid or maintenance' of a denominational school, as such words are contemplated by article 9, section 4, of the State Constitution."

The Constitution of the State of Maryland prohibits the use of public funds for public purposes. An Act of the Maryland Assembly provided for transportation of children attending school other than private schools. It was contended in the case of *Board of Education of Baltimore County v. Wheat,* 199 A. 628, 630, 632, that the Act in question was unconstitutional. but the Supreme Court of the State held to the contrary: "School attendance is compulsory, and attendance at private or parochial schools is in compliance with the law . . . Starting with the interest which the state is acknowledged to have in seeing that all children of school age require an education by attending some school and the fact they are complying with the law in going to such a school as the parochial school in this case, their accommodation in the buses appears to the Court to be within the proper limits of the enforcement of the duty imposed . . . The fact that private schools, including parochial schools, receive a benefit from it could not prevent the Legislature performing the public function."

The question of religion is not in this case at all. Under the Constitution and the very genius of our democratic institutions the Church and the State are and shall forevermore remain separate. It would thus be a contradiction in terms for the State to make a distinction between children because of differing religious faiths.

The children of today are the citizens of tomorrow. Many of the bare-kneed tots who wait for a lift along the dusty margins of a country road will one day be manning the Ship of State. Whether they will be qualified to handle the ship of America's destiny in calm and in stormy waters will depend to a great extent on the training they receive in their formative

years. The emphasis, therefore, should be on amplifying rather than restricting the means which will permit children to obtain as much schooling as possible.

The Majority does not point out,—indeed it cannot,—any possible gain to anyone in Robinson Township through the process of closing the doors of an unfilled auto bus to children on their way to training for a future of understanding, competence, and tolerance, the only kind of a future which can be a guarantee of perpetuity of our democratic institutions. On the contrary, all the evidence, all the law, and all the rules of good human relationship shining through the ages, point to the wisdom, the justice, and the consistency in law, of allowing the officials of Robinson Township to continue their program of statesmanlike benevolence which not only does not decrease the assets in the exchequer of the Township but enriches it with the greatest wealth which America possesses—equality of opportunity to all.