### Reed Estate

528

*John J. Kelly,* for accountant.

*Hugh P. Connolly,* for Commonwealth.

*Joseph F. M. Baldi, 2nd,* trustee ad litem.

SHOYER, J., June 12, 1962.—Decedent died October 7, 1960, intestate, not survived by a spouse, and leaving, as appears from the statement of proposed distribution, as the sole person entitled to her estate under the intestate laws, a first cousin, B, who is stated to be sui juris and to have had notice of the audit.

Letters of administration were granted to the accountant on November 16, 1960, and proof of publication of the grant of same is hereto annexed.

Transfer inheritance tax has not been paid.

The claim of the first cousin presents an unusual situation, because both she and decedent were illegitimate. So far as I have been advised, this is the first time in this Commonwealth that an illegitimate has made claim to the estate of a collateral illegitimate. The right of claimant rests on section 7(a) of the Intestate Act of April 24, 1947, P. L. 80, 20 PS §1.7(a), which reads as follows:

"(a) Child of mother. For purposes of descent by, from and through an illegitimate, he shall be considered the child of his mother but not of his father."

By undisputed documentary records of birth, baptism and death, it was proven that decedent was born out of wedlock in 1916 to Mabel B. when the latter was

19 years of age. At that time, the household consisted of Mabel, her sister, Mildred, their mother, May, and their aunt, Martha. Mabel assumed the name of "Mrs. Reed" upon the insistence of her mother and aunt. Some 24 years later, Mildred B., the younger and only sister of Mabel, bore the claimant, B, out of wedlock. Mabel died in 1928. B grew up in the same household with decedent and Mildred, the other members of the family having died, and was raised to believe that decedent, her first cousin, was the sister of B's mother instead of her niece. B began to wonder about the true relationship when she was about 17 years old. Shocked by the realization that she had been raised in deception, she ran away from home.

B was married in West Virginia, misrepresenting her age by some two years, in order that a license could be obtained without her mother's consent.

She returned to her mother's home in October of 1959. Her mother's death followed shortly, on November 18, 1959. B, together with her husband and baby, continued to live with her cousin Isabelle until the death of the latter on October 7, 1960. B and decedent were the sole issue of their respective mothers who apparently were never married. No evidence was presented as to the existence of possible paternal kin of decedent.

It seems certain that under the law of Pennsylvania as it stood prior to the Intestate Act of 1947, B could not have inherited from her first cousin. The Intestate Act of 1917 restricted lineal inheritance to the mother and maternal grandparents of the illegitimate (section 15(a), 20 PS §92), and collateral inheritance to the brothers and sisters of the illegitimate (section 15(b), 20 PS §93). "The intent of this section is to legitimate an illegitimate child only so far as is provided by clauses (a) and (b) hereof": Act of June 7, 1917, P. L. 429, sec. 15(c), 20 PS §94.

There is an illuminating parallel between illegitimacy and adoption in both intestate acts. The language of the 1917 Act gave broader rights of inheritance than theretofore existed to *adopted* persons by providing that the adopted person and "the adopting parent or parents shall, respectively, inherit and take, by devolution from and through each other . . ." (section 16(a), 20 PS §101). Thus, the adopted daughter of a man who predeceased the decedent, his brother, inherited the share of her adoptive father in Cave's Estate, 326 Pa. 358 (1937). In construing the 1917 Act, our Supreme Court said (pp. 364-366) : ". . . We have no hesitancy now in deciding . . . that the Intestate Act of 1917 permits of no reasonable construction other than that, by its terms, an adopted child has the same right of inheritance from the collateral kindred of his adoptive parents as a natural child of such parents would have. The court below [held] . . . that an adopted child is not entitled to inherit an estate in which his adoptive parent never had a vested interest. Such a construction of section 16 of the Intestate Act is wholly untenable. It gives no effect to the word 'through.' If it be held that the adoptive parent must have had a vested interest in property in order to entitle the adopted child to inherit it, the Intestate Act has added nothing to previous legislation, since that had already provided for direct inheritance by the adopted child from the adoptive parent of property owned by the latter. But the Intestate Act, copying the phraseology of the Act of May 28, 1915, P. L. 580, provided for inheritance by the adopted child and the adopting parent 'from *and through* each other.' The word 'from' contemplates the death of either the adopted child or the adoptive parent, the statute giving the survivor the right to inherit from the deceased. But the word 'through' extends the inheritance rights of both the adopted child and the adoptive parent to

those arising by virtue of representation of each other for purposes of devolution, thereby qualifying them to inherit, not merely from one another, but from one another's relatives and kindred through the channel left open by the death of either. The word 'through' presupposes the death of the adopted child or the adoptive parent, leaving the other surviving, and entitling him to inherit from a third person in the right of the one thus deceased. When a child inherits from a parent property of which the latter is seised, he takes 'from,' but not 'through,' such parent. When, on the other hand, he inherits property from a third person by right of representation of his parent who would have inherited the property were he living, he takes 'through,' not 'from,' his parent. By the use of both words—'from' and 'through'—it is clear the legislature intended that the adopted child should have the right to inherit not only property in which his adoptive parent himself owned a vested interest, but property of kindred of his adoptive parent which the latter would have inherited had he been living, and which, by reason of his death, passes 'through' him to his adopted child as it would have done, to use the language of section 16(a), 'if the person adopted had been born a lawful child of the adopting parent or parents.' "

Although the language in the 1947 Act was changed slightly, it was intended to retain the rule of Cave's Estate. See the comment of the Joint State Government Commission to section 8, 20 PS §1.8. The Commission's comment to section 7, 20 PS §1.7 is even more pertinent and is as follows: "Commission's Comment: Section 7 (this section) on illegitimates and section 8, 20 PS §1.8, on adopted persons have been rewritten to provide simpler language than that contained in sections 14, 15, and 16 of Act 1917, June 7, P. L. 429, 20 PS §§91-95, 101, 102. So far as possible, the language of each section has been made to conform

with the language of the other section so that court interpretation of either by analogy will apply to the other."

Following the reasoning of our Supreme Court in Cave's Estate, supra, we conclude without hesitation that B has the same right of inheritance from the collateral kindred of her mother that her mother would have had. So long as the claim of inheritance is exclusively through the maternal line, it matters not that decedent and B were both illegitimate. See Bregy, Pennsylvania Intestate, Wills and Estates Act of 1947 (1949), pp. 854-5.

By statute, this court has exclusive jurisdiction over the distribution of decedents' estates: Orphans' Court Act of August 10, 1951, P. L. 1163, sec. 301(1), 20 PS §2080.301 (1). The authority to distribute carries with it the responsibility to distribute in accordance with the law of Pennsylvania. In approving the claim of B, the auditing judge has not overlooked the recent statute of December 17, 1959, P. L. 1916, 48 PS §§169.1, 169.2, entitled "An Act Relating to the legitimacy of children born of void or voidable marriages", and reading as follows: "Section 1. In all cases where a supposed or alleged marriage is contracted, which is absolutely void by reason of one of the parties thereto having a spouse living at the time of the supposed or alleged marriage, or if for any other lawful reason, the said marriage was void or voidable when contracted, all children born to such parties shall be deemed the legitimate children of both parties for all purposes.

"Section 2. The provisions of this act shall not affect any property rights that have vested prior to the effective date of this act."

The auditing judge is not aware of any decision construing the above statute. By its express terms this act applies only when there is a "supposed" marriage

which is "void or voidable" for any "lawful reason". But what is a "supposed" marriage? Must the natural parents have gone through a ceremony of some sort? Applied for a marriage license, but not used it? Cohabited as husband and wife after going through a common law ceremony which the survivor "supposed" was valid? Or would a purely *imaginary* marriage satisfy the language of the statute? Would signing a joint obligation as husband and wife suffice? Or naming the survivor as the espoused beneficiary of a life insurance policy? Or holding title to property, either real or personal, as husband and wife? Or merely signing a hotel register as husband and wife? Or, more specifically, is the fact that decedent's mother was known as "*Mrs.* Reed" to her daughter and persons outside the family sufficient?

To *whom* is it a "supposed" marriage? To one or both of the two parties involved? Or to one or more third parties?

Spurious claims could be asserted, grounded on the above statute and with nothing more substantial than the above suppositions or their like to support them. "Void or voidable" for a "lawful reason" would encompass mere nonexistence, for the statute does not require the safeguard of good faith or innocence on the part of either party.

Had decedent been reputed legitimate, the auditing judge would have required positive evidence that all paternal kin had predeceased her. This is always the rule when the closest known heirs are first cousins. All first cousins, being in the same degree of consanguinity, take in equal shares, and, therefore; both the paternal and maternal sides of the family tree must be accounted for. To prove heirs on the maternal side alone, and then confess complete lack of information as to the possible paternal heirs would prevent any distribution whatsoever.

Here, because of claimant's own testimony, and to protect the interests of any possible heirs in the paternal line, whose existence is presently unascertained, the auditing judge appointed Joseph F. M. Baldi, 2nd, Esq., as trustee ad litem for unborn and unascertained persons.

Claimant testified to a conversation she had with decedent within the year prior to decedent's death. "She said, 'I never knew who my father was.' I said, 'Was your mother ever married?' She said, 'I don't know whether she was or not.' That ended the conversation."

Mrs. Rodden, a long time friend of the family who had known decedent and her mother since the former was two years old, proved a thoroughly credible witness. In discussing with Mabel her marital status, Mabel "told me that she had gotten into trouble and had this child, and that her mother and aunt wanted her to use the name of Missus so that there would be no embarrassment to any of the family, so she used the name of Mrs. Reed."

The trustee ad litem is unable to establish any evidence of a possible marriage of decedent's mother other than the admitted fact that she was known as *Mrs. Reed.* Because of this established fact and the act of 1959, he contends that the court should follow its usual practice and withhold distribution until the possibility of heirs on the paternal side is definitely excluded. The auditing judge is not disposed to delay his decree of distribution.

The auditing judge deems the act of 1959 to be unwise and ill-considered legislation, and upon careful consideration of this entire record he has decided to forego calling upon claimant for proof of the nonexistence of decedent's paternal kin. Despite the contentions of the trustee ad litem that this record and the statute require such proof, the auditing judge is

not here compelled to graft the provisions of the 1959 statute upon the Intestate Act. Inevitably, any attempt to do so must fail. Section 2 of the Act of 1959 obviously is designed to affect future property rights because of its express non-application to rights which have vested prior thereto. Yet the title gives no indication that the act affects property rights in any respect or that it is intended to repeal the pertinent sections of the Intestate Act of 1947. The Intestate Act (sec. 16) was "intended as an entire and complete system regulating the descent of the real and personal estates of persons dying wholly or partially intestate." Yet the Act of 1959, by classifying as legitimate certain of those children that have been considered illegitimate heretofore, is in direct conflict with and in opposition to section 7(a) of the Intestate Act which says such a child shall *not* "be considered the child . . . of his father." So clearly and absolutely are the two provisions in antagonism that they cannot stand together. Repeal of a statute is a question of legislative intent, and it has always been the rule in Pennsylvania that repeal by implication is not favored: Commonwealth ex rel. Schrier v. Ruggles, 280 Pa. 568, 571; Graham v. City of Philadelphia, 88 Pa. Superior Ct. 250, 257. Failure of the legislature to provide an express repealer in the body of the Act of 1959, and to give notice of the same in the title, requires a judicial declaration that this statute is unconstitutional insofar as it attempts to affect property rights regulated by the Intestate Act of 1947. There is a clear violation of article 3, sec. 3, of the Constitution, which requires that the subject of a law shall be clearly expressed in its title: Brown's Estate, 152 Pa. 401, 404-5; Commonwealth v. Lakey, 88 Pa. Superior Ct. 399, 402.

While the presumption is always in favor of the constitutionality of a statute: Statutory Construction Act, May 28, 1937, P. L. 1019, art. IV, sec. 52 (3),

46 PS §552 (3), a court cannot approve that which is clearly and plainly in violation of the constitution: Allentown School District Mercantile Tax Case 370 Pa. 161, 166.

Undoubtedly the Act of 1959 was passed without the same thoughtful attention given to the Intestate Act. This latter was one of a series of statutes drafted, after the most careful study, by a group of outstanding lawyers and judges known as the Advisory Committee on Decedents' Estates of the Joint State Government Commission of the General Assembly. This commission was activated by a senatorial resolution to "study, revise and prepare for reënactment" the laws pertaining to decedents' estates. Adoption of a "complete system" of intestate devolution, done after such careful consideration, should not be undone with any less thought and care. The auditing judge believes the Act of 1959 to have been ill-conceived; assuredly it is unconstitutional . . .

And now, June 12, 1962, the account is confirmed nisi.

### Opinion sur Exceptions

KLEIN, P. J., June 22, 1962.—We are in complete agreement with the auditing judge that under the provisions of section 7(a) of the Intestate Act of 1947, an illegitimate child can now inherit from an illegitimate maternal first cousin, in this instance, the child of her deceased mother's deceased sister. We also agree with his conclusion that B, the first cousin, is the only person entitled to the decedent's estate under the intestate laws.

In support of his decision, Judge Shoyer, in a well-reasoned and scholarly discussion, concluded that the Act of December 17, 1959, P. L. 1916, 48 PS §169.1, §169.2, described in its title as "Relating to the legitimacy of children born of void or voidable marriages" is unconstitutional. We do not deem it necessary, how-

ever, for us to pass upon the constitutionality of this statute in order to reach a decision in this case.

It is a fundamental rule of law that a court will not pass upon the constitutionality of a statute unless it is *absolutely* necessary to do so in order to decide the issue before it: Rupert v. Policemen's Relief and Pension Fund, 387 Pa. 627 (1957); Robinson Township School District v. Houghton, 387 Pa. 236 (1956); Altieri v. Allentown Officers' and Employees' Retirement Board, 368 Pa. 176 (1951); Bedford v. Shilling, 4 S. & R. 400 (1818).

There is not a scintilla of evidence in this record to suggest that Mabel B, decedent's mother, ever contracted any kind of marriage, void or voidable, with a man named Reed or any other person. Consequently, the provisions of the statute could not possibly be applicable to the situation before us. We, therefore, refrain from expressing our views with respect to the constitutionality of the statute in question.

The exceptions of the trustee ad litem are accordingly dismissed and the adjudication is confirmed absolutely.