## Rawdin v. Bristol Township School District

*Weiss, Nelson & Moskowitz,* for plaintiffs.

*Begley, Carlin, Mandio, Kelton & Popkin,* for defendants.

*Peter A. Glascott,* for intervenors.

BODLEY, J., March 29, 1968.—In this equity action, plaintiff, a citizen and taxpayer of defendant school district, seeks to enjoin the school district from expending public funds for the purpose of transporting resident pupils of Bristol Township to nonpublic schools located in Bristol Borough. The basis of the action is the alleged illegality of the school district's resolution of August 17, 1967, which authorized the extension of busing such private school students to St. Ann's and St. Mark's parochial schools. The said resolution was adopted by the school board by vote of six "ayes" and three "nays". The six named individual defendants are those school board members who voted in favor of the resolution.

By leave of court, certain other persons were permitted to intervene, some as parties plaintiff and some as intervenors in support of the action of the school board. Following the filing of an answer to the complaint and a reply to new matter contained in the answer, a hearing was held before the undersigned on

October 23, 1967, for the purpose of completing the record. The matter was then placed upon the argument list and was heard by the court en banc.

The record reveals that in September 1965, defendant school district, for the first time, commenced busing nonpublic school students who resided within the township, by virtue of authority granted the school board by the Act of June 15, 1965, P. L. 133, 24 PS §13-1361. In order to accommodate the increased passenger load of the school district's fleet of buses, now numbering 57, the school administrators worked out schedules under which public school students would first be picked up by each bus involved and eventually dropped at their respective schools and, after making three such trips, each bus would then start upon a separate schedule during which it would pick up parochial school students only and drop them off at a designated point within Bristol Township. Two or more separate trips for the parochial school students were also made by each bus involved. Naturally, in order to permit the repeated use of each individual bus, the starting times for the various schools, both public and parochial, necessarily varied. Whether such starting times were fixed in order to accommodate the busing problem or whether this is merely a coincidence, does not appear of record, nor is it of any importance to the determination of the matter before us. And, although it would appear that other parochial school students may have been, and may continue to be, transported by the public school buses under the arrangements authorized in September 1965, the action before us concerns only the busing of those parochial school students who attend St. Ann's Parochial School and St. Mark's Parochial School in Bristol Borough.

When the busing schedules were first set up in September 1965, to accommodate the parochial school students who lived within the township and attended St.

Ann's and St. Mark's Schools in Bristol Borough, such
students were picked up by the buses involved at various
points within the township and discharged at
Landreth Manor Circle in Bristol Township, this point
being the point closest to St. Ann's and St. Mark's
Parochial Schools on the then existing established public
school bus route. Because of police complaint, apparently
resulting from the discharge and consequent
milling around of some 500 parochial school students,
the point of discharge was changed after a week's time,
for safety reasons, to Cherry Street, also located within
Bristol Township, but nearer to the parochial school
destination and approximately four-tenths of a mile
away from Landreth Manor Circle. Until September
1967, the Bristol Township school authorities continued
the above-recited practice of picking up the
parochial school students and discharging them at
Cherry Street in the morning, and then, with schedules
reversed, the same buses would pick up the parochial
school students at the Cherry Street location and drop
them off at various points within Bristol Township so
that they might return to their homes. From September
1965, until the system was changed in September
1967, school buses, maintained by St. Mark's and St.
Ann's Parochial Schools, met these children in the
morning at the Cherry Street location in Bristol
Township and transported them on to their respective
schools. In the afternoon, the parochial school buses
would return the school children to the Cherry Street
location, at which point the public school buses would
then load them and transport them back to the various
stops within Bristol Township.

Under the authorization of the resolution, dated
August 17, 1967, the practice was changed, in September
1967, so that the 10 Bristol Township public school
buses involved no longer dropped off the children at
Cherry Street in the morning, nor picked them up at

Cherry Street in the afternoon. The practice also changed so that no longer did the parochial school buses from St. Mark's and St. Ann's meet the parochial school students, as they did theretofore, in order to transport them to such schools within Bristol Borough. Rather, under the authorization of the challenged school board resolution, the public school buses of Bristol Township, beginning September 1967, picked up the township's parochial school students, as they did theretofore, at various points within the township, and then transported such students directly to the doors of St. Mark's Parochial School and St. Ann's Parochial School. The net result has been that 10 public school buses, owned by the defendant school board, are used for two or three round trips in the morning and two or three round trips in the afternoon to transport the parochial school students from various points within Bristol Township to their respective parochial schools in Bristol Borough and back again in the afternoon.

The record indicates that prior to September 1967, the 10 buses involved traveled 60 miles per day upon the task of delivering the nonpublic school students involved. After September 1967, each of the 10 buses traveled an additional 3.9 miles per day, by virtue of the extension of the schedule from Cherry Street to the schools involved. The record also indicates that the gross cost per mile per bus is 46.3 cents and the reimbursement from the State for such mileage is 43.8 percent of the total expenditure. The School District of Bristol Township is a coterminus district, that is to say, all of the public school children served by the district reside in and go to school within the township.

It is acknowledged by all concerned that, in transporting public school students from the various bus stops within the township to the various public schools, none of the buses ever proceed to the vicinity of St.

Mark's or St. Ann's Parochial Schools in Bristol Borough. The public and private school students are not mixed; that is, no bus, during its travel to and from the public school, picks up a parochial school student, and no bus, during its travel to and from the parochial schools, picks up a public school student. The routes followed by the 10 buses involved in transporting students to St. Mark's and St. Ann's schools are basically the same as those routes traveled by the school buses transporting public school pupils, except for the deviation from the established route within the township in order to transport the students directly to St. Ann's and St. Mark's schools. It is the opinion of the transportation coordinator of defendant school board that, in order to intermix the public and parochial school students during the same bus trip, it would be necessary for the school district to double its present bus fleet of 57. The 5 starting times of the 5 different schools served by the 10 buses we are concerned with enable these buses to make extra trips, thus utilizing the same bus for a number of trips and thus avoiding the purchase of additional buses, the cost of each of which is approximated at $8,400. The 1967-68 fiscal year budget of defendant school district is $10,400,000.

As indicated heretofore, plaintiff seeks to have this court declare that the resolution adopted by the Bristol Township School Board on August 17, 1967, is illegal and also seeks to enjoin the expenditure of the funds involved in the implementation of the said resolution; specifically, the expenditure of funds for the purpose of transporting the parochial school students to St. Ann's and St. Mark's schools. In support of plaintiff's position, it is urged that the resolution and mode of busing outlined above is in violation of the plain dictates of the enabling act, Act of June 15, 1965, P. L. 133, 24 PS §13-1361 (hereinafter referred to, for convenience, as Act 91); that the individual defendant

school board members, in adopting the said motion and in expending funds to implement it, abused their discretion and acted in an arbitrary and capricious manner to the prejudice of the public interest; that, in voting in favor of said resolution and authorizing the expenditure of such funds, the individual defendants acted with knowledge of the invalidity of the motion and thus acted in bad faith; and that the continued expenditure of such funds for the alleged illegal transportation of students will cause substantial and irreparable damages to the citizens and taxpayers of the defendant school district. Thus, in the present action, we are not concerned with a protest relating to the entire busing system set up by the defendant school board, but merely with the legality of the questioned resolution and the expenditure of funds for the busing of parochial school students who live in the township to their respective schools outside of the township.

In order for a court of equity to grant the sort of relief here sought, it must be shown that the school board acted  illegally or not in good faith. "It is only where the board transcends the limits of its legal discretion that it is amenable to the injunctive processes of a court of equity": Detwiler v. Hatfield Borough School District, 376 Pa. 555, 566 (1954) ; Landerman v. Churchill Area School District, 414 Pa. 530, 534 (1964). Although plaintiff's burden is a heavy one, we conclude with reluctance that such burden has been met in the instant case.

Much public controversy has been aroused over the years concerning the separation of church and State, and emotions run high when specific issues involving this constitutional principle develop. Although it may be difficult for some people to comprehend how the Supreme Court of the United States could interpret the First Amendment of the Unted States Constitution, which prohibits the establishment of religion and

guarantees the free exercise thereof, in such a manner as to strike down the recital of prayers in public schools, even when attendance was on a voluntary basis, this the court has done: Engel v. Vitale, 370 U.S. 421 (1962); Abington School District v. Schempp, 374 U. S. 203 (1963). The court found that the saying of such prayers, even though nondenominational, constituted an invasion of that "wall of separation" between church and State which is guaranteed by this amendment to the Constitution. Nonetheless, interpreting a New Jersey statute, quite similar to that with which we are here concerned, the Supreme Court of the United States concluded that the use of public funds to reimburse parents for money expended by them for bus transportation of their children to nonpublic schools was not violative of the First Amendment: Everson v. Board of Education of the Township of Ewing, 330 U. S. 1 (1946). While some may disagree with these conclusions, they nevertheless represent the law of the land and we are bound by such decisions.

In any event, with this background, the Pennsylvania legislature, on June 15, 1965, adopted Act 91, amending the Public School Code of 1949, in the following language:

"The board of school directors in any school district *may*, out of the funds of the district, provide for the free transportation of any resident pupil to and from the public schools and to and from any points in the Commonwealth in order to provide tours for any purpose connected with the educational pursuits of the pupils. When provision is made by a board of school directors for the transportation of resident pupils to and from the public schools, the board of school directors *shall* also make provision for the free transportation of pupils who regularly attend nonpublic elementary and high schools not operated for profit. Such

transportation provided for pupils attending non-public elementary and high schools not operated for profit *shall be over established public school bus routes.* Such pupils shall be transported *to and from the point or points on such routes* nearest or most convenient to the school which such pupils attend. The board of school directors shall provide such transportation whenever so required by any of the provisions of this act or any other act of Assembly. . . ." (Italics supplied.)

That, in relevant part, is exactly what the legislature said on the subject of transporting, by public school buses, the pupils of Bristol Township who regularly attend a nonpublic elementary or high school not operated for profit. Although Act 91 announced in its title that its purpose was to provide for the "health, welfare and safety of the children of the Commonwealth", not unexpectedly, the constitutionality of Act 91 was promptly challenged as being, inter alia, violative of the First Amendment to the Constitution of the United States, as applied to the Commonwealth of Pennsylvania by the Fourteenth Amendment, and as violative, inter alia, of article X, sec. 2, of the Pennsylvania Constitution, which states that:

"No money raised for the support of the public schools of the Commonwealth shall be appropriated to or used for the support of any sectarian school".

Just as promptly, the Supreme Court of Pennsylvania, in Rhoades v. Abington Township School District, 424 Pa. 202 (1967), upheld the constitutionality of Act 91, concluding that it was, in fact, an act designed to protect school children from the hazards of highway traffic, and, therefore, properly came under the heading of "health, welfare and safety" and was not an involvement of government into the field of religion. The court relied heavily upon Everson v. Board of Education, supra, so far as the Federal Constitution was

involved and largely upon reason, so far as the State Constitution was concerned. Although Mr. Chief Justice Bell and Mr. Justice Cohen dissented and would have held Act 91 to be unconstitutional, the question has been, for the time being, put to rest. As stated by Mr. Justice Roberts, in his concurring opinion, at page 233, joined by Mr. Justice Jones, Mr. Justice Eagan and Mr. Justice O'Brien:

"Thus, what is ultimately persuasive to me in the instant case is not only that Act 91 is a welfare measure, but also the fact that the transportation of students is, in the phrase of Everson, 'so separate and indisputably marked off' from functions in any sense associated with religion".

We are, therefore, dealing with a statute which does not offend the United States or State Constitution, yet one which has broadened and enlarged the statutory powers of school directors under the Public School Code of 1949.

Prior to the enactment of Act 91, by article XII, sec. 1361 of the Public School Code of 1949, 24 PS §1361, the power to supply free transportation to school students was granted in the following language:

"The board of school directors in any school district may, out of the funds of the district, provide for the free transportation of any resident pupil to and from the public schools and to and from any points in the Commonwealth in order to provide tours for any purpose connected with the educational pursuits of the pupils. They shall provide such transportation whenever so required by any of the provisions of this act or of any other act of Assembly".

It will be noted in passing that the free transportation contemplated by the above section of the School Code was not limited to the use of school buses, but covered as well ". . . either school conveyances, private conveyances, or electric railways, or other com-

mon carriers, . . .": 24 PS §13-1362. This section has not been changed by Act 91. It is also noted that, under Act 91, it is mandated that any school district which provides free transportation to pupils to and from public schools must now ". . . also make provision for the free transportation of pupils who regularly attend nonpublic elementary and high schools not operated for profit". Clearly, St. Ann's and St. Mark's Parochial Schools are not operated for profit and no such contention has been made. Just as clearly, the pupils whom Bristol Township Board of School Directors are transporting to St. Ann's and St. Mark's Parochial Schools are pupils who regularly attend such nonpublic schools. The thrust of plaintiff's argument in the case at bar is that Act 91 requires that defendant school board transport the nonpublic school pupils *over established public school bus routes*. The act plainly says so. Further, plaintiff argues that such nonpublic school pupils shall, in the words of Act 91, ". . . be transported to and from the point or points *on such route* nearest or most convenient to the school which such pupils attend." (Italics supplied.)

The act also plainly so requires. And, says plaintiff, if defendant school board is transporting nonpublic school students in a manner not authorized by Act 91, they are, by virtue thereof, spending public funds for a purpose not authorized by law. And this is prohibited by article VI, sec. 610, of the Public School Code of 1949, 24 PS §6-610, which provides, inter alia:

"The use or payment of any public school funds of any school district, in a manner or for any purpose not provided in this act, shall be illegal".

The question, of course, is, what is an "established public school bus route"? And, subsidiary thereto, may be asked the question, what does Act 91 mean when it states that the nonpublic school pupils shall be transported to and from the point or points ". . . on such

routes nearest or most convenient to the school which such pupils attend"? Were this language unclear or ambiguous, we might turn to the Statutory Construction Act of May 28, 1937, P. L. 1019, art. IV, sec. 51, 46 PS §551, which provides the formula to be applied in the search of the legislative intent. However, resort to the rules of statutory construction can be permitted only when there is ambiguity in the meaning of the language used: Kritz Estate, 387 Pa. 223 (1956). The rule of law is that statutory language must be construed as written: Kent v. Rothensies, 120 F. 2d 476 (3rd Cir.) (1941); Rich v. Meadville Park Theatre Corporation, 360 Pa. 338 (1948).

We are here faced with plain language. Prior to the passage of Act 91, the school boards of this Commonwealth had no legal power or authority to transport nonpublic school students in the public school buses. The passage of Act 91 made such transportation possible, but possible only within the framework intended by the legislature. The legislature provided that such transportation of nonpublic school students *must be over "established public school bus routes"* and that such pupils should be transported to and from a point *"on such routes"*. There was no authority in the School Code for a school board's transportation of nonpublic school pupils in public school owned buses, prior to the passage of Act 91: Robinson Township School District v. Houghton, 387 Pa. 236 (1956). And we find that there is no authority in the School Code which permits the busing of nonpublic school pupils under Act 91 in the manner complained of in this case.

But, it is argued, a public school bus route, once established, is not an immutable, permanent and unchanging thing. It is argued that a public school bus route, once established, is necessarily changed from time to time to meet the exigencies which grow out of change of traffic pattern, location of resident students,

etc. With this, we certainly agree. The problem is that we are speaking of "established *public school* bus routes". Act 91 does not authorize the establishment of *nonpublic school bus routes.* We are not here called upon to determine whether or not the *system* set up by defendant school board, in September, 1965, under which it runs *public school bus routes* and *nonpublic school bus routes,* is authorized by statute and we do not do so, since orderly judicial procedure requires that nothing be passed upon by a court other than the justiciable question presented to it: Robinson Twp. School District v. Houghton, supra, at page 240. However, we do find that defendant school board committed an ultra vires act when it adopted the complained of resolution of August 17, 1967, and is illegally expending public moneys in the transporting of nonpublic school students to St. Ann's and St. Mark's Parochial Schools in Bristol Borough.

The motion of August 17, 1967, is couched in the following language:

"Motion by Mr. McGrath, seconded by Mrs. Blatt, to extend busing—to permit busing of students residing in Bristol Township to St. Mark's and St. Ann's school in Bristol Borough".

As heretofore indicated, the six persons named individually as defendants voted "aye" for the passage of this resolution, with three other directors voting "nay". The record reveals that, upon implementing this resolution, the school administrators expend public funds for the transportation of nonpublic school students over routes which by no stretch of the imagination can be considered as *"established public school bus routes".* It is clear on this record that a Bristol Township public school bus route would, under no circumstances, enter the vicinity of St. Ann's or St. Mark's schools. In diverting the buses in question from Bristol Township to the parochial schools in Bristol

Borough, the school board and the school administrators are doing exactly that which the act did not contemplate. They established *nonpublic* school bus routes for the convenience of the parochial school students and are *not* transporting such students to and from the point or points on established public school bus routes nearest or most convenient to the schools which such pupils attend as they are required to do by Act 91. Both the resolution and the implementation thereof are clearly unlawful and are actions which were not contemplated by Act 91.

Were this conclusion to be seriously challenged, we need only turn to the language of the Supreme Court, as voiced by Mr. Justice Roberts in his concurring opinion in Rhoades, supra, at page 234:

"The simple fact is that Act 91 does not even envision the use of a public facility within the confines of a religious institution; on the contrary, the language of Act 91 suggests that in many instances *parochial school students will not even be carried to the doors of their schools*". (Italics supplied.)

One needs no gift of vision nor particular imagination to understand the meaning of the language contained in Act 91. Although admittedly a public school bus route, once established, may be lawfully changed from time to time, it cannot be termed "an established public school bus route" if such route is established solely for the convenience of nonpublic school students. The behavior of the Bristol Township Board of School Directors is exactly that which those who opposed the enactment of Act 91 envisioned. Senator Preston B. Davis, Chairman of the Senate Education Committee, upon opening the public hearings relating to Senate Bill 3 (later Act 91), stated to those gathered:

"Though all of the germane bills before the Senate would provide public transportation for nonpublic schools, examination of the bills shows that they vary

significantly when it comes to specific provisions. For example, Senate Bill 3 would make it mandatory upon Boards of School Directors to transport pupils attending nonpublic elementary and high schools, not operated for profit, over established school bus routes. Senate Bill 113 would make it mandatory to furnish transportation to pupils attending nonpublic elementary and high schools on substantially a similar basis to the way public school children are transported. Obviously, these bills differ significantly with respect to both the accommodations which they would provide, if favorably acted upon, and the costs which they would impose upon local school districts in the Commonwealth": Stenographic Report of Public Hearing before Senate Education Committee re Senate Bill 3 and House Bill No. 381, March 24, 1965, pages 6 and 7.

S. William Hollingsworth, Jr., appearing in opposition to Senate Bill No. 3, stated:

"The term 'established routes' is vague. Does it mean no new routes may be established? Who will establish routes? School boards normally establish their routes to suit their needs. The location of private and parochial schools will bring pressure upon school board members to change routes to serve those schools better. For example, the public school is in the west side of Smithdale, a fictitious town. A Catholic school is in the center of town. A private elementary school is located just inside the eastern boundary of a town. Some parents are starting a new Seventh Day Adventists' on the north side. The public school buses which had served only one school will now seek to serve all of these schools on its 'established route.' So the citizens say, 'Let's change the routes and run the buses all over town so all the kids get to school.' Will the school board submit to this? Where and what are the 'established routes'?

"The term 'established routes' is meaningless because it has no context to give it definition and lacks any specific program to embody the phrase": Ibid., pages 83-4.

Fred Heddinger, representing the Pennsylvania School Boards Association, and protesting the passage of Act 91, stated:

"It has been proposed that transportation for private school students be limited to available space on existing buses which travel over existing bus routes. This is nothing more than a device to duck the basic issue. In practice, we know full well that local school boards and local public school administrators cannot hope to withstand the pressure that will follow for additional buses, additional bus routes, and added bus schedules to suit the private school classroom schedules. Recognizing this at the outset, we may as well admit that what is being proposed is bus transportation for private school purposes equal in every respect to what is being furnished to public school students": Ibid., page 91.

It would appear clear that the defendant board of school directors did not "withstand the pressure" that Mr. Heddinger contemplated in his remarks.

During continued hearings before the Senate Education Committee on March 25, 1965, Thomas M. Kerr, Jr., representing the American Civil Liberties Union of Pennsylvania, stated:

"Where will the established route be? Certainly there is no grandfather's clause implied here. The routes are going to change. Where will they be changed to in the future? The buses are not now running empty so more buses will have to run. How many more will be run? How many drivers will we put on? Where will the buses stop? Couldn't the bus turn off and just go in here, and so on, and all of these will be brought up before the already burdened and already busy and

already self-sacrificing school board": Stenographic Report of Public Hearing before Senate Education Committee re Senate Bill No. 3 and House Bill No. 381, March 25, 1965, pages 81-82.

Mr. O. James Davis, before the same committee, stated:

"The transportation need under consideration is pointed to as being for the welfare and safety to the child, with relation to the supporting institution. Now, if this is really the case, then why is a bill presented to the General Assembly which shows little concern for the child? Only the children on 'established bus routes' are considered. Many safety hazards would still remain between the existing drop off point and the private school in question. Conditions would be made more difficult by the fact that now it would be a crowd of children walking together. The amendment to House Bill 381, which was defeated, would have improved the safety factor for all children": Ibid., page 93.

Mr. Harry Boyer, President of Pennsylvania AFL-CIO, stated to the Senate Committee:

"First of all, there are two basic legislative proposals under consideration:

"(1) Providing school bus transportation for nonpublic school children (Catholic and private school students) along existing school bus routes for public school children.

"That, I understand to be Senate 3 and House 381 [later Act 91].

"Mr. Dennison says:

"'(2) Providing public school bus transportation directly for the nonpublic school children to their nonpublic schools.'

"Gentlemen, as you know, neither of these bills [Senate 3 and House 381] do this, and these as well as some other distortions of interpretation of what this legislation is intended to do, it seems to me, has un-

necessarily increased public sentiment to the extent that it does appear in opposition to either or both of these measures": Ibid., page 111.

At the hearings conducted by the Senate Education Committee on March 31, 1965, the Rev. Mason F. McGinness stated, at page 18 of the stenographic report:

"We find inconsistencies in Bill No. 3. If this bill were a true 'welfare and safety' measure, it would not make distinction, as it does, as to bus routes. It would require that nonpublic school children be delivered to the safest place which, obviously, would be at the door of the school which they attend, and not, as the bill says, '. . . to the point or points nearest or most convenient to the schools which such pupils attend' ".

A proponent of the bill, Mr. Carmen R. Capone, State Deputy of the Knights of Columbus, stated to the Senate Education Committee:

"It has become recognized that the basic problem of safety demands that there also be enacted a fair transportation law for all nonpublic school students. This, the members of the Knights of Columbus feel, is present in Senate Bill No. 3, now before your honorable Committee. It is a just bill, for it provides transportation for all students along established routes. The present bus transportation available only to public school students is unfair and discriminatory, for it does not provide for the transportation of the nonpublic school students to and from their schools *and along the same established routes already authorized for the benefit of those nonpublic school students*". Ibid., page 88.

Another proponent of the bill, Virginia Murrin, President of the Pittsburgh Diocesan Council of the National Council of Catholic Women, stated to the committee, at page 100 of the stenographic report, made March 31, 1965:

"The bill in question would merely provide the same service to all the children, which is now considered a proper service for 'some' of the children. *It goes no further than to allow children to ride school buses along already established routes.* While this might, indeed, require that more buses be put in service than in the past, this bill *would not require the establishment of any new routes,* in order to pick up or discharge passengers".

An articulate supporter of the bill, Joseph F. O'Kicki, representing the Holy Name Society of the Altoona-Johnstown Diocese, stated, at page 108 of the report:

"Dr. Reber asked, 'Will transportation be provided only within the limits of the school district, or will transportation be provided to the school intended?' Again, the gentleman should know that Senate Bill 3 *in no sense opens up transportation for the nonpublic school child so as to extend it beyond the public school district in which that child resides"*.

At still a further hearing held April 1, 1965, Mr. Thomas F. O'Leary, a spokesman for the Holy Name Societies of the Diocese of Pittsburgh, stated to the Senate committee, at page 54 of its stenographic report:

"When and wherever school districts provide from public funds, transportation to schools, those facilities should certainly be made available to any student *traveling in the same direction, on the way to or from school, at least, as far as possible, on established routes"*.

At the same hearing, Beatrice Mahedy, a member of the Teachers' Sodality, stated, at page 87 of the report:

"We would like to urge that the present bus transportation bills be quickly amended to provide for the unloading of all passengers at the schools of their choice. To do otherwise would be dangerous to the

safety of some of the smaller children, and to their health in bad weather".

Were there any question concerning the intent of the legislature in the passage of Act 91, one can turn to statements made during debate upon House Bill No. 381 (later Act 91) for final resolution of the legislative intent. Mr. Mullen, one of the proponents of the bill, stated, inter alia:

"We are going to provide bus transportation for those students who can travel on the established routes which are now in existence for the public school students." Vol. I, Legislative Journal, House of Representatives, page 180, March 8, 1965.

He further stated:

"It only provides for bus transportation for those children who may be able to reach the established route. In many instances, it may still be necessary for local private schools who have private buses to continue the use of bus service because their children may not be able to reach the established routes. In other words, this is not a benefit directly to any particular school; it is only for the children providing they can meet the standards set up in the bill": Vol. I, Legislative Journal, House of Representatives, page 206, March 9, 1965.

A sponsor of the bill, Mr. Ryan, during the same debate in the House of Representatives upon House Bill No. 381, stated, inter alia:

"The answer to this, from the Attorney General's Office, Edward Friedman, is: First, the bill specifically provides that buses should travel over established public school bus routes. In my opinion, this language is not susceptible for authorizing any deviation from such established public school bus routes. *It is the manifest intention of the statute that no additional schedules be established to accommodate the nonpublic school pupils, but that the transportation facility be*

*made available to them at the same time it is made available to the public school pupils"*: Vol. I, Legislative Journal, House of Representatives, page 220, March 9, 1965.

Mr. Ryan then engaged in the following colloquy:

"Mr. Coughlin: Finally, could I ask, Mr. Speaker, in the definition of 'established routes,' are these routes determined and established only to service the public schools or may they be established to service the nonpublic schools directly?

"Mr. Ryan: I think the bill, Mr. Speaker, as drafted, says that when any board of school directors makes provision for transporting public school students, et cetera, it would be up to the school board of the school district to establish their route. What it would be would guide them in establishing it, I do not think it is up to us.

"Mr. Coughlin: Would it be however—

"Mr. Ryan: Pardon me, the route, I believe, would have to be established primarily for the public school system, the established bus route for that system.

"Mr. Coughlin: *And it would be your intent as a sponsor of the bill that the established routes should be established to service the public school system?*

"Mr. Ryan: *I do not think there is any question about that, yes.*": Vol. I, Legislative Journal, House of Representatives, page 221, March 9, 1965. (Italics supplied throughout.)

Although it is difficult to conceive how the language of Act 91 could leave doubt in anyone's mind concerning the legislative intent, yet if such doubt does exist, it seems to us that the record of the House debate and the record of the Senate hearings should put such doubt to rest. It conclusively appears that the legislators envisioned a yellow public school bus, passing a nonpublic school student and possibly passing a nonpublic school, while transporting public school students

to the public school. The legislators also obviously envisioned empty seats in the yellow school bus and conceived, by Act 91, a scheme under which the nonpublic school student might lawfully be picked up by the public school bus and delivered to his school, or, if this were not possible, then to a point "nearest or most convenient to the school". The opponents of the legislation foresaw the sort of action which might be taken by a school district and which in fact was the action taken by defendant school district. Whatever motives may have led one person or another or one group or another to support or oppose the bills which subsequently led to the passage of Act 91, it is clear that the legislation, as passed, did not contemplate the implementation taken by defendant school board. In a strikingly similar case, the Superior Court of New Jersey, Law Division, on January 19, 1967, came to the same conclusion as do we. See Fox v. Board of Education of West Milford, 93 N. J. Super. 544, 226 A. 2d 471 (1967). The language of the act there involved was this:

"When any school district provides any transportation for public school children to and from school, transportation from any point in such established school route to any other point in such established school route shall be supplied to school children residing in such school district in going to and from school other than a public school, except such school as is operated for profit in whole or in part".

The School Board of West Milford did exactly that which defendant school board did, namely, the board created routes designed solely for nonpublic school children without regard to the established public school routes. The court there held, and we think rightly so, that the establishment of such routes for nonpublic school children and the expenditure of public funds for that purpose was violative of the legislative

intent expressed in the section of the enabling act quoted above.

We reach the same conclusion in the case before us. The resolution of defendant school board which was passed August 17, 1967, was without legal authority and hence is void and of no effect. The implementation of the void resolution is also without legal authority and the expenditure of funds in the busing of the non-public school children in the manner heretofore outlined is illegal.

Accordingly, we enter the following

## ORDER

And now, March 29, 1968, it is ordered and decreed that defendants be, and hereby are, permanently enjoined from transporting the nonpublic school pupils here in question to private schools, namely, St. Ann's Parochial School and St. Mark's Parochial School, along routes which are not established public school bus routes, and are enjoined from expending funds for such purpose; and, further, the resolution adopted by the Bristol Township Board of School Directors on August 17, 1967, is hereby declared to have been illegal and hence is invalid, null and void.

## CONCURRING OPINION
### By Judge Garb

I reluctantly concur with the opinion of the court. It is unfortunate that this will result in greater danger to the nonpublic school children in dropping them in large numbers some distance from their school, great police and traffic problems in having large numbers of children at the point of discharge on the streets, and great expense to the school district in the possible necessary acquisition of a larger fleet of school buses, inasmuch as the school district is apparently *mandated* to transport these children. However, I agree that the

language of the act clearly compels the conclusion reached.

Judge Power joins in this concurring opinion.